## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL DEWAYNE HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 2:08-cv-1682-PWG |
| WAL-MART STORES EAST, L.P.[1], | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an employment discrimination case brought pursuant to Title VII of the Civil Rights Act ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., by Michael Dewayne Hill, *pro se*, against his former employer, Wal-Mart Stores East, L.P. (hereinafter "Wal-Mart").  Hill asserts that he was subjected to both same-sex and opposite-sex sexual harassment and unlawful retaliation that resulted in his termination.  The parties have consented to exercise of plenary jurisdiction by a magistrate judge, pursuant to 28 U.S.C. § 636(c)(1).  (Doc.[2] 31).  The action is now before the court on Wal-Mart's motion for summary judgment.  (Doc. 44).  For the reasons that follow, Wal-Mart's motion is due to be granted as it pertains to all claims with the exception of Hill's hostile work environment claim based on same-sex harassment.

## I.      SUMMARY JUDGMENT STANDARDS

Rule 56(c)(2), Fed. R. Civ. P., provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

---

[1]      The complaint identifies the defendant as "Walmart Stores, Inc."  The defendant has informed the court, however, that it has been misidentified in the complaint and that its proper name is "Wal-Mart Stores East, L.P." (Doc. 7 at 1 n.1).  The court directs the clerk to change the case style on the docket sheet accordingly.

[2]      References herein to "Doc. __" are to the docket numbers assigned by the Clerk of the Court to the pleadings filed in this matter.

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment

> bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Once the moving party has met its burden, Rule 56(e), FED. R. CIV. P., "requires the nonmoving party to go beyond the pleadings and by affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Accordingly, in its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## II.   BACKGROUND[3]

Hill, an African-American male, was hired by Wal-Mart to work at its store located in Homewood, Alabama, in May 2003. From that time until his termination on August 15, 2007, Hill worked as a stocker in the dairy department on the overnight shift. In that capacity, he was

---

[3]   At summary judgment, the court views the facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts nor all of the facts. *See Crawford v. Carroll*, 529 F.3d 961, 964 n.1 (11th Cir. 2008).

responsible for stocking dairy products on the shelves, unloading trucks, cleaning and organizing the dairy cooler, and rotating the products so that out-of-date dairy items were removed from the shelves. (Deposition of Plaintiff Michael Hill ("Pl. Dep."), Exhibit A to Evidentiary Materials in Support of Wal-Mart's Motion for Summary Judgment ("Wal-Mart Evid. Sub."), Doc. 46, at 53-54).

### A.      Sexual Harassment

Hill describes the work environment at the store generally as being laced with profanity and sexual humor and discourse.  (Pl. Dep. at 86).  Hill denies, however, that he used profanity in the workplace, with the exception of one occasion when he admits he stated that he was "tired of" one female co-employee, Madolyn Wyatt "acting like a bitch towards [him]."  (*Id.* at 86-87).  Soon after Hill starting working at the store, rumors began to circulate among the employees that Hill was a virgin.  Hill acknowledges that, if asked about it by his co-workers, he admitted that such was the case. (*Id.* at 88-89).  While some employees would joke or tease him about his virginity, Hill acknowledges that he did not complain to anyone about it.  (*Id.* at 93-94).  According to Mr. Hill, several of Hill's co-workers expressed an interest in altering his sexual-experience status.  Several women working at the store offered to have sex with him for money, but he turned them down. Again, he did not report this as a problem to anyone.  (*Id.* at 92, 94-96).  On several occasions, male co-workers also offered to "find [him] a girl and get a room" and that "all [he] had to do was show up," but Hill always told them "no."  (Pl. Dep. at 91-92).  Finally, one of Hill's co-workers in the dairy department, Sean Davis, picked him up one day to go to work together, but Davis instead took Hill to see "this girl he [knew]" for the purpose of having Hill engage in sexual intercourse with her. (*Id.* at 90).  Hill acknowledges that he assented and began the process "but due to [his] nervousness of the situation" he did not "fulfill[ ] the full sexual experience."  (*Id.*)  When Hill and Davis

reported to work thereafter, a group of male employees had gathered in the maintenance department closet and they started cheering for Hill when he walked in the door.  (*Id.* at 147).  Hill was surprised that they already knew, and he admitted to them that Davis had taken him to see the woman, but he did not give any details.  (*Id.* at 147-48).  Hill does not suggest that he took offense to this situation or that he complained to anyone.  During the relevant time period Hill was supervised by at least three assistant store managers, Luther Daniels, Caprice Cameron, and Stephen Hobbs.

Hill also states that during his time at the store he approached eight female employees and asked for their respective phone numbers, with an accompanying expression that he was interested in getting to know them. (Pl. Dep. at 149-51).  Hill denies, however, that he engaged or participated in sexually explicit talk in the workplace, except in the context of referencing sexual acts when speaking to Toshiba Williams, an African-American female co-worker with whom Hill alleges he had a sexual relationship at work.  (*Id.* at 86-87).  Hill says that  his affair with Williams, whom Hill alleges later subjected him to what he characterizes as sexual harassment, began in the dairy department in June or July of 2006.  (*Id.* at 192).  At that time, Hill, Williams, and a white male co-employee named Melvin "Wesley" Bailey, were stocking produce together in the dairy case.  (*Id.* at 192).  Hill alleges that Bailey, a homosexual, had a crush on him and sexually harassed him.  Hill alleges that Bailey said that he "would like a man with a dick the size of a roll of cookie dough" (Doc. 1 at 15) that was stocked in the dairy case, and on several occasions he had inquired of Hill whether his genitalia was "big like" the cookie dough tube-shaped container.  (Pl. Dep. at 192-93, 201).  Hill says that while he "normally" answered that question "no," in this instance he said "yes." (*Id.* at 193).  Williams responded by telling Hill, "Show me."  (*Id.*)  Hill initially thought that Williams was joking and that he would "play along," telling her to come into the cooler.  (*Id.*)  She

4

did so and stood there, prompting Hill to ask if she was "for real." (*Id.*)  She replied that she was and added, "[H]urry up, because I ain't got all day." (Pl. Dep. at 192-93).  By this time, Bailey had also entered the cooler. (*Id.*)  Hill told him to leave, but Bailey refused. (*Id.*)  Evidently not deterred by Bailey's presence, Hill turned towards Williams and exposed his penis. (*Id.*)  The next night, Hill attempted to apologize to Williams about the incident, but he claims she responded by asking to "touch it." (Pl. Dep. at 230).  On another occasion Hill and Williams again went to the cooler to engage in kissing, fondling, and other sexual touching. (*Id.* at 230-31).  They repeated that scene about fifteen times over the next five months or so, retreating to the cooler to "fool around" on nights when they were working together.[4]  (*Id.* at 234-36).

By October and November 2006, however, Hill's relationship with Williams began to sour, with Williams canceling plans to meet outside of work to have sex. (*Id.*)  Thereafter, Williams began to avoid Hill.  She told him that she did not want to talk with him about getting together and that she had no time to call him, although other times she would suggest that she was still willing to have sex with him. (Pl. Dep. at 234-36).  Continuing to put Hill off, Williams said that she would have sex with him, but only if he paid her $150. (*Id.* at 236-39).  Hill ultimately refused, stating that he could not "afford that," even after Williams offered a plan for him to pay $50 out of his next three paychecks. (*Id.*)  In March 2007, Hill says he told Williams that he was tired of her "playing games" with him and that he was no longer interested in pursuing a sexual relationship with her. (*Id.*)

---

[4]     In her declaration, Williams asserts that Hill was spreading what she characterized as "rumors" about them having an "affair," although she does expressly deny that she had a sexual relationship with Hill.  (Declaration of Toshiba Williams ("Williams Decl."), Exhibit C to Wal-Mart Evid. Sub., ¶ 4) Williams does claim that Hill exposed himself while she was working in the cooler with Bailey.  However, she disputes his assertion that she was at all the instigator.  She alleges, rather, that Hill simply walked into the cooler, said something to the effect of "Look at how big my dick is," and exposed himself.  (Williams Decl. ¶ 4).  Bailey's testimony corroborates Williams's version.  (Bailey Decl., ¶ 6).  But Williams expressly denies those allegations (Pl. Dep. at 194), and the court is bound at summary judgment to credit Hill's testimony.

Shortly thereafter, in about April 2007, Williams took a medical leave.  (*Id.* at 238-39, 159).

After Williams had been off for about a month, Hill called her on her cell phone to see how she was

doing.  (*Id.* at 159).  Williams became upset and demanded to know how Hill had obtained her phone

number.  (*Id.* at 159-60).   After returning to work in July, 2007, Williams complained to

management about Hill, stating she feared for her safety, because, she says, he had been "following

[her] around," he had called her once on her cell phone, and he had "spread rumors that [they] had

had an affair." (Declaration of Toshiba Williams ("Williams Decl."), Exhibit C to Wal-Mart Evid.

Sub., ¶ 5).  Hill admits that he told numerous co-employees at the store that he and Williams had a

sexual relationship.  (Pl. Dep. at 160-61).  He says he did not do so, however, until late July 2007

and that he told only because he had heard from other employees that Williams was herself telling

other employees that she was afraid that Hill would kill her and that he was "crazy like the Virginia

Tech killer."  (*Id.* at 161).  Therefore, Hill says, he "wanted the truth to be out there"  because he felt

as if management was "questioning everybody about the situation but [him]."  (*Id.* at 162; *see also*

*id.* at 82-83).  Hill also acknowledges that after Williams complained about him, he was told by

Daniels that he was "not to speak, look, or be around [Williams] in any way" and that if she [was]

in a certain area, Hill had to leave."  (Doc. 1 at 10; *see also* Pl. Dep. at 164).  Cameron states that

she instructed Hill to "stay away" from Williams "[o]n at least one occasion."  (Cameron Decl. ¶ 4).

While Hill says that he was not told that such directives were specifically the result of Williams's

sexual harassment complaint, he recognizes that Daniels advised that he should not speak to

Williams or be around her so that he "wouldn't get in anymore (sic) trouble" and would not "be

accused of anything."  (Pl. Dep. at 164).

6

Hill also seems to suggest that he was subjected to sexual harassment by Madolyn Wyatt, a female stocker in the grocery department.  Hill had approached her and told her that he "thought she was attractive and that [he] just wanted to get to know her a little better," (Pl. Dep. at 154), and he asked for her phone number.  (*Id.* at 157).  Wyatt, who was substantially older than Hill, told him, however, that he was "too young and inexperienced for her."  (*Id.* at 154).  Hill says that when he would speak to her, she would at times act as if he "was chasing her" and "try to make [him] look like [he] was trying to get with her," but she would put him down in front of other employees, noting that he did not have a car and stating that "[h]e was never going to get no  pussy from her."  (*Id.* at 155-57).  If Hill ignored her for a period though, she would approach him to talk or to ask him to help her do something, which led Hill to question whether "she was being serious or trying to play hard to get."  (*Id.* at 155).  One night in July 2007, Wyatt came into the dairy department with her daughter and introduced her to Bailey and Williams, but not to Hill, at whom she simply looked and rolled her eyes.  (Pl. Dep. at 155; Doc. 1 at 23).  This prompted Hill to say in front of Bailey and Williams that he was "tired of [Wyatt] acting like a bitch towards [him]," a comment that Bailey told Hill he had relayed back to Wyatt.  (Pl. Dep. at 87, 155, 274).  In about the spring of 2007, Hill suggests that Wyatt became upset when he hugged a female cashier in front of her in the break room, and she told two co-employees to tell Hill that Wyatt wanted him to leave her alone.  (*Id.* at 272-73).  Hill acknowledges that an overnight manager similarly indicated that Wyatt had asked him to speak with Hill about staying away from her.  (*Id.*)  Hill asked the manager to call Wyatt into the office so that he could tell her that he had not said anything, but the manager told Hill that he should not even speak to her because it would just be "better not to get involved in any type of correspondence." (*Id.*)

Hill also claims that, during the course of his employment, he was subjected to repeated remarks and advances of a homosexual nature by Bailey.  During the first two years of Hill's employment, Bailey worked in the housewares department, so Hill would typically see him only at break times.  (Pl. Dep. at 196).  Hill claims that it was during that early period of his employment, though, that Bailey first indicated sexual interest in him.  Hill recalls that, on Halloween in 2004, Wal-Mart allowed store employees to dress up for the occasion, and Bailey came to work dressed as a woman, complete with fake breasts, makeup, a long blonde wig, a tight sweater, blue jeans, and heels.  (*Id.* at 197; Doc. 1 at 14-15).  During the lunch period that night, Hill was in a smoking area off the break room when Bailey approached and asked "in a very woman-like voice" if he could eat with Hill.  (Pl. Dep. at 197; Doc. 1 at 15).  Claiming that Bailey "had a certain look on his face" led Hill to believe that Bailey "had an interest in [him]," Hill told him, "No, thank you," and Hill went back outside.  (Pl. Dep. at 197-98).

From those ambiguous if strange beginnings, Bailey later escalated his advances by making unsolicited, exceedingly vulgar sexual invitations and comments to Hill.[5]  Hill describes Bailey generally as being "overly expressive of his homosexuality," suggesting that he would try to get attention by "turn[ing] every conversation and every sentence into something homosexual, just pretty much beat people over the head with it."  (*Id.* at 170-71).  The first such specific instance that Hill

---

[5]    Bailey denies generally that he ever made "any sexually inappropriate comments" to Hill.   (Declaration of Melvin Wesley Bailey ("Bailey Decl."), Exhibit B to Wal-Mart Evid. Sub., ¶¶ 8).  Indeed, Bailey asserts that it was actually Hill that would "frequently discuss sex at work" in "very graphic" terms.  (*Id.* ¶ 3).  Hill denies doing so.  At summary judgment, of course, Hill's testimony on these matters must be credited by the court.  The court would also recognize that does "not explicate this vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read as having created an environment that a reasonable person would find hostile or abusive."  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) (en banc) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993))).

recites occurred while Hill, Bailey, and several other overnight employees were standing in front of

the store on a break in 2004 while Bailey was still working in housewares.  At that time, Hill says,

Bailey saw fit to advertise that he "could take about ten and a half inches of penis down his throat

without gagging."  (*Id.* at 203-04).  Such discourse became much more frequent and specific to Hill

when Bailey was transferred to the dairy department in about November or December 2005.  (Pl.

Dep. at 200).  From that time until his termination in mid-August 2007, Hill estimates that he

worked with Bailey about four nights per week and that Bailey made crude sexual remarks "every

single time" that they worked together (*id.* at 202), as Bailey "would constantly bother [him] with

comments about having sex with him or trying to convince [him] there's nothing wrong with having

sex with a man."  (*Id.* at 184).  Bailey expressed his sexual interest to Hill in various terms, ranging

from metaphor, such as telling Hill that he "wanted to ride his train" (*id.* at 177), to the

extraordinarily concrete, as telling Hill that he, Bailey, had "masturbated ... with a dildo in the

shower" one morning after they worked together "because [Hill] had made him so hot."  (*Id.* at 204).

Hill told Bailey early on that his sexual comments were unwelcome, advising Bailey that he was not

sexually interested in men and that Bailey should not speak to him in such a manner. (*Id.* at 214-15;

EEOC Charge, Exhibit 17 to Pl. Dep.).  Nonetheless, Bailey continued to pursue him, repeatedly

inviting Hill to engage in anal intercourse.  Hill claims that Bailey also stated approximately twenty-

five times that since "none of the women are giving [Hill] any pussy, that [he] could have some of

[Bailey's] leftovers," (Pl. Dep. at 200-01), telling Hill that "a hole is a hole."  (*Id.* at 207).  Other

times Bailey phrased his overtures as offers to Hill of "some backdoor pussy."  (*Id.* at 205, 210).

When Hill once responded that "there ain't no such thing," Bailey added that "it gets wet like a

pussy."  (*Id.* at 205).  Bailey further told Hill that he "uses vaginal cleanser to clean his anus"

because "he has to keep it clean like a pussy." (*Id.*)  Hill recalls that Bailey once stated in front of him and at least one other employee in that Hill "needed a big dick up his ass." (Pl. Dep. at 184). Also, as alluded to previously, Bailey inquired "several times" of Hill whether he was "big like" the tube-shaped container of cookie dough stocked in the dairy case. (*Id.* at 192-93, 201).  Bailey also stated to Hill in reference to oral sex that "not all mouths feel the same." (*Id.* at 207).  Bailey advised Hill, "If you like big titties, I've got something at home in the closet," which Hill inferred was a reference to the fake breasts Bailey had previously used to accessorize his Halloween costume. (*Id.* at 202).  Hill also recounts an episode in July 2007 whereupon Bailey attempted to arrange a contest in which Hill, while blindfolded, would try to feel "the difference" between the "butts" of Bailey and Toshiba Williams, a female co-worker whose relationship with Hill is further discussed below. (Pl. Dep. at 206-07).  Bailey proposed this to Hill, Williams, and Davis, and Bailey offered to bet Hill and Davis that Hill would be unsuccessful in the identification endeavor. (*Id.*)  However, both Williams and Hill refused to participate. (*Id.*)  Finally, Hill alleges that when he would reject Bailey's advances or show attention to female customers or co-workers, Bailey would often act jealous and retaliate by complaining to supervisors about Hill, which he says would at times result in supervisors verbally criticizing Hill's work or making Hill perform additional job tasks, some of which were normally Bailey's responsibility. (*See id.* at 97, 104-05, 169-70, 173-74, 178-80, 182).

Hill says he did believe that Bailey was serious in his sexual advances. (Pl. Dep. at 192). Hill admits, however, that Bailey never touched him inappropriately and that he did not feel "threatened" by him. (*Id.* at 192, 198).  Hill, who does not own a car or drive, also acknowledges that he had asked for and accepted rides from Bailey to drive him home "once in a while," when the people with whom Hill normally rode were unavailable, with the last such time occurring in 2006.

10

(*Id.* at 190-91).  Hill similarly states that he had accompanied Bailey when Bailey offered that he was going to drive to a nearby McDonald's restaurant to pick up some lunch and bring it back to the store, with the last such time occurring in about early 2007.  (*Id.*)

In about June 2006, in an effort to get away from Bailey, Hill filed applications on Wal-Mart's computer system seeking to be transferred to another department.  (Pl. Dep. at 189-90; EEOC Charge).  He applied for each position that paid the same or more than he was making.  (Pl. Dep. at 189-90).  Hill, however, was never contacted about these transfer applications.  (*Id.* at 190).

At all times material, Wal-Mart had in effect and distributed written policies and procedures designed to address sexual harassment and other inappropriate conduct in the workplace, including an "Open Door" policy by which employees could relay complaints.  (Pl. Dep. at 114-16, 147; Dft. Exh. 6, 8, 14 to Pl. Dep.; Declararation of Gery Fuller ("Fuller Decl."), Exh. F to Wal-Mart Evid. Sub., ¶ 3).  Under the Open Door policy, employees were encouraged first to go through an "immediate supervisor," but were authorized to contact successively higher levels of supervisors or salaried members of management, or to call a Wal-Mart "Regional Personnel Manager, People Director, or any level of supervision or management they choose."  (Exh. 6 to Pl. Dep. ("Open Door Policy") at 1-2).  Hill acknowledges that he was aware of the relevant policies and procedures and had received a written copy of them. (Pl. Dep. at 114-16, 147).

During his employment, Hill complained about Bailey to a number of Wal-Mart supervisors. Many of those complaints were admittedly of a general or personal nature, such as that Bailey generally was treated more favorably and was "manipulating" supervisors to "have his way" with job tasks and work assignments or to "get [Hill] in trouble," or to get more credit for his work than he deserved.  (*See, e.g.*, Pl. Dep. at 169-175, 182-83).  On some occasions, however, Hill made

complaints that did to a greater or lesser degree reference the sexual nature of Bailey's statements and advances towards him.  These included a complaint in 2005 to Stephen Hobbs, a store assistant manager, about Bailey being "overly expressive in his homosexuality," but Hobbs told Hill just to ignore it and concentrate on his work.  (*Id.* at 66, 170-71).  Hill says he also complained to Luther Daniels (*id.* at 175-79), an assistant store manager.  (*Id.* at 68).  Hill told Daniels that although Bailey's "expressions of his homosexuality was just general," when speaking to Hill, Bailey would "be very specific in his statements," that is, "talk[ing] about stuff he wanted to do with [Hill] ... as far as having sex or anything like that." (*Id.* at 176).  Hill further alleges that Bailey had made "a lot" of his sexual comments "in front of everybody," including Daniels.  (Pl. Dep. at 177).  One such instance that Hill recalls occurred when Bailey had said that he "wanted to ride [Hill's] train," whereupon Daniels joined in, adding that Bailey "wanted to blow [Hill's] whistle." (*Id.*)  According to Hill, when he complained to Daniels about Bailey's homosexual comments, Bailey downplayed them, suggesting that Bailey was "only playing around" and "joking" and that Hill "shouldn't take him seriously."  (*Id.* at 176).

Hill also complained to Caprice Cameron, a store assistant manager (*see* Declaration of Caprice Cameron ("Cameron Declaration" or "Cameron Decl."), Exhibit D to Wal-Mart's Evid. Sub., ¶ 2), about how Bailey "would constantly bother [him] with comments about having sex with him or try[] to convince [him] there's nothing wrong with having sex with a man." (Pl. Dep. at 184).  Hill made such complaints to Cameron "in passing" on the store floor "several times" between 2005 and 2007.  (*Id.* at 185-86).  Hill also relates that Bailey was actually speaking directly to Cameron

on the occasion when he stated that Hill "need a big dick up [his] ass." (*Id.* at 184)[6]. Hill suggests that he made a more "official complaint" to Cameron in a store office in June 2007, at which time he asked her for advice about how to handle the situation with Bailey. (*Id.* at 186). She responded by asking Hill if he wanted to file a sexual harassment complaint. (*Id.*) Hill said that although he had issues with Bailey, he did not want him to lose his job, so he asked if he, Hill, could be transferred to another department at the store so that he would not have to work around Bailey. (*Id.*) Cameron said that she would make a request to store co-manager John Welsh that Hill be transferred to the maintenance department. (Pl. Dep. at 186-87). That transfer request was not granted, although Hill was not given a reason for that denial. (*Id.* at 187, 216; EEOC Charge). Hill did not again thereafter pursue a sexual harassment complaint against Bailey because he thought that management "clearly favored" Bailey such that a complaint would be "irrelevant." (*Id.* at 187-88).

### B.     Disciplinary Actions and Termination

For other than "gross misconduct" by an employee, Wal-Mart utilizes a progressive disciplinary procedure involving a four-step "Coaching for Improvement" process. (*See* "Coaching for Improvement" Policy, Exhibit 5 to Pl. Dep.). Level One is a "verbal coaching," in which a supervisor counsels the employee that their conduct or performance does not meet expectations. (Coaching for Improvement Policy at 2). Level Two is a "written coaching" that involves a written acknowledgment by the employee being disciplined and a "detailed action plan" for improvement. (*Id.* at 2-3). Level Three of the policy is known as "Decision-Making Day," at which point, the employee is given one day off with pay to consider his continued employment and must meet with

---

[6]     Cameron denies that she ever heard Bailey "make any sexually inappropriate comments to or about Mr. Hill." (Cameron Decl. ¶ 4).

a manager to discuss the action plan and his commitment to making required improvements.  (*Id.* at 3).  Once the employee has been given a Decision-Making Day, he is subject to immediate termination, the fourth and final step in the process, for any further formal disciplinary infraction occurring in the succeeding twelve months.  (*Id.*)

Hill had been subject to some formal discipline in 2004 and 2005 (*see* Exhibits 9 & 10 to Pl. Dep.).  Hill does suggest that those actions were unlawful or played a role in his termination in August, 2007.  The first step allegedly leading to the termination decision occurred when Hill received a verbal coaching on January 18, 2007, for failing to finish his work by leaving several "rocket carts in the freezer" and "continu[ing] to give less than 100% on a daily basis."  (Exhibit 11 to Pl. Dep.; *see also* Pl. Dep. at 122-25).  Hill contends that this disciplinary action was in "retaliation" for "hurting [the] ego" of one of his supervisors, Harold Kirkpatrick.  (Doc. 1 at 8).  The second step was a written coaching issued on March 24, 2007.  Daniels wrote Hill up because he was allegedly "standing around talking to off the clock associates when he was warned previously." (Exhibit 2 to Pl. Dep.).  Daniels further stated, "[Hill's] performance is less than standard and needs to improve immediately."  (*Id.*)  Hill acknowledged receipt of the reprimand, noting that he understood management's concerns pertaining to his job performance and that  he would do his best to improve.  (*Id.*)  Hill also admits that he spoke "in passing" to an off-the-clock employee "for a minute" that night and that Daniels walked by them, but Hill denies that he "stop[ped working] for a long period of time just standing there conversating (sic)."  (Pl. Dep. at 77).  Instead, Hill suggests, this was a "retaliatory write-up" that was actually motivated by the fact that Hill had embarrassed Kirkpatrick in front of two female trainees and other employees that same night.  (*See id.* at 73-77).

On June 5, 2007, Hill was issued a Decision-Day write-up, representing the third step in Wal-Mart's progressive discipline. (Exhibit 12 to Pl. Dep.). On that occasion, Cameron documented that Hill had not cleaned the dairy cooler. (*Id.*) Hill admits that he did not finish cleaning the cooler that night (Pl. Dep. 81-82, 126-127), that he clocked out ten minutes before the end of his shift, and did not respond to a page to return to the back of the store. (Exhibit 12 to Pl. Dep.). Hill also asserted, however, that he was "pushing for time" after having stocked several pallets of dairy products and that he actually cut his lunch period short so he could clock out early to shop for several items without missing his ride home. (*Id.*) Hill similarly seems vaguely to assert in his deposition that cleaning out the cooler is "everybody's responsibility" and that Cameron may have directed him to perform tasks in the grocery department or in general merchandise so he "didn't have time" to clean out the cooler. (Pl. Dep. at 127-28). Hill also alleges that Cameron told him that she wrote him up on this occasion because she was afraid that her supervisor, store manager Phillip Jones, "could have said something" if she didn't. (*Id.* at 81). Cameron says in her declaration, however, that she "was not pressured by any other member of management to administer this coaching." (Cameron Decl. ¶ 6). In any case, Hill understood that his next write-up would cause his termination. (Pl. Dep. at 129).

In the early morning hours of August 9, 2007, Hill went to the store on his off-day to pick up his paycheck. (Doc. 1 at 10; Pl. Dep. at 140-41). At that time, he saw Daniels, who instructed him not to go into the dairy department. (*Id.* at 10; Pl. Dep. at 140-41). Hill admits he disobeyed that directive, however, because he believed that it was improper for Daniels to instruct him while he was off the clock. (Id.; *see also* Exhibit 15 to Pl. Dep.) Hill went to the dairy department, picked up some milk to take home, and stopped to have a conversation with Sean Davis, who was then

working.  (Doc. 1 at 10; Pl. Dep. at 164-65).  Hill acknowledges that he also saw Williams in the department that night but that he stayed away from her and even left the area to "avoid confrontation and keep peace."  (Pl. Dep. at 164-65; Doc. 1 at 10-11).  As Hill was leaving the department, however, he encountered Daniels who yelled at Hill for disobeying him.  (Doc. 1 at 11).

On August 10, 2007, Hill alleges that he received phone calls from two co-employees who warned him that they had heard from Cameron that management was going to fire Hill.  (Doc. 1 at 25).  Hill says this prompted him to contact Gery Fuller, a Wal-Mart market human resources manager, and he "explained to him the situation."  He told Fuller he was being fired because Williams had made a false sexual harassment claim against him and how Bailey had "manipulated management."  (Pl. Dep. at 195-96).  Fuller told Hill that he should not get upset and that he should not believe he was getting terminated just because somebody called him and told him so.  (*Id.* at 195).

That night, Hill was called into the office by Daniels and Cameron, where they were joined by two other supervisors.  (*Id.* at 130).  According to Hill, Daniels stated that a customer had called and said that Hill was using severe profanity, "every cuss word in the book," and that since he had already had a Decision-Making Day, they were going to terminate him.  (Pl. Dep. at 132).  Hill responded by asking what customer had reported that, and Daniels replied that he did not know and that he had not taken the call.  (*Id.*)  When Hill then asked whether they were firing people based just on people calling in randomly without investigating, Daniels said he "[did not] know about all that" but that "he was told to terminate [Hill]."  (*Id.*)  Hill continued to argue that the allegation that a customer had complained about him did not make sense because he does not use profanity, no customer would have been able to identify him anyway because he does not wear a name tag and he

looks and dresses like many other employees, and it was unlikely that a customer would go home to call instead of complaining to a manager at the store.  (*Id.* at 132-136).  In any case, Hill reminded them, they could not fire him until he spoke with the store manager.  (*Id.* at 136).  The supervisors called store co-manager John Welsh, who confirmed that Hill did have a right to speak with the store manager first.  (*Id.* at 131).

The next morning, August 11th, Hill attended a meeting with Welsh, Cameron, and another employee, Carl Spencer.  (Pl. Dep. at 137).  At that time, Welsh said he had been told that a customer had complained that Hill had used profanity on the sales floor, an allegation that Hill denied.  (Declaration of John Welsh ("Welsh Declaration" or "Welsh Decl."), Exhibit E to Wal-Mart Evid. Sub., ¶ 5).  Hill further stated that Hill said he felt like this anonymous- customer-call story had been fabricated to "set [him] up" to be fired because of the harassment complaints against him.  (Pl. Dep. at 139-40).  Hill has also acknowledged that during that meeting, Welsh raised an issue about Hill having disobeyed Daniels order a few nights earlier not to go into the dairy department.  (Doc. 1 at 13).  At the conclusion of the meeting, Welsh stated that he would conduct an investigation and that, while it was pending, Hill could continue working.  (Pl. Dep. at 138).

On August 15, 2007, Welsh told Hill that he was terminated.  (Pl. Dep. at 138, 140).  Wal-Mart now acknowledges that it was Bailey, rather than a customer, that had reported to management that Hill had cursed at Williams in the presence of a customer, and that it was that complaint that led to Hill's termination.  (*See* Bailey Decl. ¶ 7; Welsh Decl. ¶ 4).  Welsh claims that after speaking with various employees and store manager Jones, he determined that Hill had used profanity on the sales floor, and that because Hill had previously had a Decision-Making Day, he had "no choice but to terminate his employment."  (Welsh Decl. ¶¶ 6, 7).  Welsh also denies that he was aware that Hill

had ever made complaints about harassment by Bailey or that he ever heard Bailey make sexually inappropriate remarks to Hill. (*Id.* ¶¶ 8, 9). Hill's "Exit Interview" documentation, which Hill refused to sign, states that he was fired for using profanity in the workplace. ("Exit Interview" Document, Exhibit 13 to Pl. Dep., Pl. Dep. 143-44; Doc. 1 at 14). According to Hill, however, Welsh suggested during the exit interview that he was being terminated because Welsh had concluded that Hill had violated Wal-Mart's "respect for the individual" policy. (Pl. Dep. at 140-41). When Hill asked in what way he did that, Welsh told him that his use of profanity was one thing (Doc. 1 at 13), as well as that he had been insubordinate by going into the dairy department when Daniels had instructed him not to. (*Id.*; Pl. Dep. at 140-41).

### C.     This Litigation

Hill filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that he had been subjected to unlawful discrimination because of "sex" and "retaliation," (EEOC Charge). (Doc. 1). The EEOC found reasonable cause to believe that Hill had been subjected to same-sex harassment by Bailey that had resulted in a hostile work environment but found that the evidence was insufficient to support that Hill had been unlawfully terminated. (Doc. 4 at 12). After receiving a right-to-sue notice, Hill filed this action by filing a form complaint for use by pro se litigants. (*Id.* at 1 at 1-5). Hill claimed that he was discriminated against because of race and in retaliation for having complained about practices he felt were in violation of Title VII, as well as that he was subjected to "same-sex sexual harassment, harassment, and intimidation." (Doc. 1 at 3). Hill attached a rambling, 24-page document in single-spaced type, setting forth Hill's work history at Wal-Mart and all perceived wrongs allegedly done to him by the company and his individual co-workers, ranging from personal slights and  embarrassing episodes to sexual advances, escapades,

and rejections to the circumstances surrounding formal and informal disciplinary actions taken against him. (Doc. 1 at 6 through 29).

Wal-Mart filed a motion to dismiss or, in the alternative, for a more definite statement (Doc. 11), and Hill filed a 29-page, single-spaced typed response that essentially restated the allegations of the attachment to his original form complaint. (Doc. 15). Pursuant to Wal-Mart's pending motion to dismiss or for a more definite statement, the court ordered Hill to again replead his complaint to comply with the Federal Rules of Civil Procedure. (Doc. 20). On April 15, 2009, Hill complied by filing a 12-page double spaced typed amended complaint, styled, "Plaintiff's Response for a More Definite Statement." (Doc. 21). In that document, Hill asserted the following claims for relief, all based upon alleged violations of Title VII: (1) "Same Sex Sexual Harassment," based on his interaction with Bailey (Doc. 21 at 1-2); (2) "Sexual Harassment," based on the actions of both Williams and Wyatt (*id.* at 3-4); (3) "Harassment," citing a number of individual supervisors and managers at the store who he suggests caused or allowed "derogatory conditions of employment so severe and pervasive it created a work atmosphere of intimidation, hostility, and abuse, [o]ffensive jokes, [r]idicule, [i]nsults and [p]ut-downs" (*id.* at 4-5); (4) "Hostile Work Environment" (*id.* at 6-9); and (5) "Retaliation," that resulted in his discharge and other alleged adversity. (*Id.* at 9-12).

Wal-Mart has moved for summary judgment on all claims (Doc. 44), and it has filed an accompanying brief (Defendant Wal-Mart Stores East, L.P.'s Memorandum of Law in Support of its Motion for Summary Judgment (Doc. 45, "Wal-Mart Summ. J. Brief"), and a supporting evidentiary submission. (Doc. 46, Wal-Mart Evid. Sub.) Hill has filed an opposition brief (Doc. 49, "Plaintiff's Memorandum of Genuine Issue in Support of His Response (sic)"("Pl. Opp. Brief")). Wal-Mart has filed a reply brief. (Doc. 52, "Defendant Wal-Mart Stores East, L.P.'s Reply in

Support of Its Motion for Summary Judgment" ("Wal-Mart Reply Brief")).  The court now turns to

Wal-Mart's motion, which is ripe for decision.

## III.   DISCUSSION

### A.   Sexually Hostile Work Environment

The first four counts of Hill's now-governing pleading, filed April 15, 2009, although

variously styled as claims for "Same Sex Sexual Harassment,""Sexual Harassment,""Harassment,"

and "Hostile Work Environment," are effectively alleging the same type of claim: that he was

subjected to sexual harassment that resulted in a hostile work environment, in violation of Title VII.

Most of Hill's allegations are based upon alleged homosexual advances and comments by a male co-

worker, Bailey, and actions allegedly against Hill after he rebuffed those advances.  Others stem, to

at least some degree, from Hill's interaction with two female co-employees, Williams and Wyatt,

and actions taken against Hill following complaints they made to supervisors about him.  (*See* Pl.

Opp. Brief at 8-9, ¶¶ E(1)-(3)).

Title VII prohibits employers from discriminating in the workplace on the basis of an

individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "When the

workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)

(citations and internal quotation marks omitted).  Further, Title VII authorizes recovery where an

employee is subjected to a hostile work environment because of sex that stems from harassment by

members of the same sex as the plaintiff, whether or not the harasser is a homosexual motivated

specifically by sexual desire. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82

(1998).  To prove a hostile work environment claim, whether based on harassment by the opposite

sex or the same sex, a plaintiff has the burden to prove at trial the following elements:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject
> to unwelcome sexual harassment, such as sexual advances, requests for sexual favors,
> and other conduct of a sexual nature; (3) that the harassment must have been based
> on the sex of the employee; (4) that the harassment was sufficiently severe or
> pervasive to alter the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) a basis for holding the
> employer liable.

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (quoting

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc) (citation omitted).

The Eleventh Circuit has further explained in this context as follows:

> "Workplace conduct is not measured in isolation." *Clark County Sch. Dist. v.
> Breeden*, 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam).
> Rather, the evidence of harassment is considered both cumulatively and in the totality
> of the circumstances.  *Mendoza*, 195 F.3d at 1242.
>
> Either severity or pervasiveness is sufficient to establish a violation of Title
> VII. *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 743, 118 S.Ct. 2257,
> 141 L.Ed.2d 633 (1998) (noting that hostile work environment claims "require[ ]
> harassment that is severe or pervasive") (emphasis added).  In evaluating allegedly
> discriminatory conduct, we consider its "frequency ...; its severity; whether it is
> physically threatening or humiliating, or a mere offensive utterance; and whether it
> unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S.
> at 23, 114 S.Ct. 367, quoted in *Mendoza*, 195 F.3d at 1258 (Tjoflat, J., concurring in
> part, and dissenting in part).
>
> Moreover, the plaintiff must prove that the environment was both subjectively
> and objectively hostile. *Id.* at 21-22, 114 S.Ct. 367.  "The employee must
> 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the
> terms or conditions of employment, and this subjective perception must be
> objectively reasonable."  *Mendoza*, 195 F.3d at 1246 (quoting Harris, 510 U.S. at
> 21-22, 114 S.Ct. 367).  "So long as the environment would reasonably be perceived,
> and is perceived, as hostile or abusive, there is no need for it also to be
> psychologically injurious."  *Harris*, 510 U.S. at 22, 114 S.Ct. 367 (citation omitted).
> "[T]he objective severity of harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering 'all the circumstances.' "

*Oncale*, 523 U.S. at 81, 118 S.Ct. 998 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

*Reeves*, 594 F.3d at 808-09.

###### 1.    "Unwelcome" Conduct

Wal-Mart first argues that it is entitled to summary judgment on Hill's hostile work environment claim related to alleged homosexual advances and comments by Bailey on the theory that Bailey's conduct at issue was not "unwelcome."  In support, Wal-Mart argues that the record establishes that proposition as a matter of law because Hill allegedly did the following:

(1)    "talked about sex with his co-Associates, including Bailey, and he expressed romantic interest in several co-Associates";

(2)    "announced to his co-Associates that he was a virgin, and he admits that he was not offended when his co-Associates expressed interest in his sexual status";

(3)    "made no effort to prevent other Associates talking about his sexual prowess upon his return to work" after Davis arranged for Hill to have sex with a woman Davis knew;

(4)    "us[ed] the words 'pussy' and 'bitch' in conversations with his co-workers";

(5)    engaged in consensual sexual acts with Williams on multiple occasions in the cooler at the store, which he has described in graphic detail in his complaint; and

(6)    "exposed his penis to Bailey (his alleged harasser) and Williams in the dairy cooler" at the store;

(Wal-Mart Summ. J. Brief at 14-15).

Several of the assertions in Wal-Mart's brief in support of its argument largely ignore the applicable summary judgment standard of review.  As such, many of the statements recited by Wal-Mart fail to acknowledge contrary testimony in Hill's deposition, or take his statements out of

context.  For example, while Hill admits to using the word "bitch" at work, he says that he did so only on a single occasion, when he said that he was "tired" of Wyatt "acting like a bitch towards" him, and he denies otherwise using profanity in the workplace during the four-plus years that he worked at the store.  Likewise, the only graphic sexual language Hill admits to in his deposition is that he used the word "pussy" and only then when speaking to Williams in the context of referring to sexual acts in their then-ongoing sexual relationship.  And to say that Hill "exposed his penis to Bailey" in the cooler is, again, technically accurate in that Bailey was present, but Hill's testimony is that he told Bailey to leave the area and he refused and that Hill attempted only to expose himself to Williams, at her invitation.  Also, while Wal-Mart states that Hill"announced" to co-workers that he was a virgin, Hill expressly denies that he "would just walk up to people and tell them that."  (Pl. Dep. at 90).  He says, rather, that if coworkers asked him about it, he understood their curiosity and was not generally offended by the question, and he would acknowledge that he was a virgin.

It is obvious that exposing oneself and otherwise engaging in sexual acts in the dairy cooler of a Wal-Mart does not comport with even the general minimum for acceptable workplace behavior. That said, even if Hill had consensual sexual interaction with Williams, in the cooler or elsewhere, and participated in some discourse that acknowledged that he was a virgin or indicated a romantic or sexual interest in other employees of the opposite sex, those circumstances do not imply that Hill thereby invited or welcomed repeated, graphic and offensive homosexual advances and propositions by Bailey.  While relevant to the "unwelcomeness" inquiry, the fact that a plaintiff engages in some salacious conduct, uses obscenities, or finds certain provocative conduct to be amusing, does not mean that the plaintiff becomes fair game as a target for any and all sexual advances or other harassment.  *See Horney v. Westfield Gage Co.*, 77 Fed. Appx. 24, 29 (1st Cir. Oct. 9, 2003).

Neither a "person's private and consensual sexual activities," *Ammons-Lewis v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 488 F.3d 739, 746 (7th Cir. 2007) (internal quotation marks and citations omitted), nor his or her "use of foul language or sexual innuendo in a consensual setting" constitute a waiver of "legal protections against unwelcome or unsolicited sexual harassment" at work. *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987) (internal quotation marks and citation omitted); *see also Nuri v. PRC, Inc.*, 13 F. Supp. 2d 1296, 1301 (M.D. Ala. 1998) ("Using foul language, or sending or receiving dirty jokes, does not waive the protections of Title VII."); *cf. Reeves*, 594 F.3d at 803-04 (holding that the evidence supported that the plaintiff endured an actionably hostile work environment notwithstanding her own use of "generic swear words, such as 'shit' or 'damn,' to express her frustration or anger.") Hill's deposition testimony and his EEOC charge support that, despite exercising questionable judgment in his pursuit of a consensual sexual relationship with Williams, he did not welcome Bailey's conduct or sexual remarks, that he told Bailey that he did not want Bailey talking to him that way, that he complained to a number of other individuals about Bailey's sexual remarks and advances, and that Hill applied for a transfer to another department so as not to have to work with Bailey. In these circumstances, there is a question for the finder of fact as to whether Bailey's conduct was unwelcome. *See EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1249 (11th Cir. 1997); *Brassfield v. Jack McLendon Furniture, Inc.*, 953 F. Supp. 1438, 1450 (M.D. Ala. 1996); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("[W]hether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact.")

24

### 2.    "Subjectively" Severe or Pervasive

Wal-Mart similarly contends that Bailey's conduct was not sufficiently severe or pervasive to be actionable, as viewed by Hill subjectively.  The foregoing discussion regarding whether Hill perceived Bailey's conduct to be unwelcome is applicable to whether Hill subjectively perceived Bailey's conduct to be so severe or pervasive as to create a hostile and abusive working environment.  *See Otu v. Papa John's USA, Inc.*, 400 F. Supp. 2d 1315, 1325 (N.D. Ga. 2005); *Balletti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1546 (S.D. Fla. 1995).  In arguments regarding the "subjective" prong of the inquiry, however, Wal-Mart emphasizes several additional circumstances.  First, Wal-Mart recounts that Hill testified that he "had no problem with" Bailey and occasionally asked Bailey to give him a ride home from work or to McDonald's.  (Wal-Mart Summ. J. Brief at 17).  Wal-Mart also alleges that Hill "refus[ed] to bring a complaint against Bailey."  (*Id.*)

Wal-Mart's contention that Hill "refused to bring a complaint against Bailey" is inaccurate.  In fact, Hill testified that he did complain about Bailey's sexual remarks and advances on multiple occasions to three different supervisory employees at the store during the period of his employment, Caprice Cameron, Luther Daniels, and Stephen Hobbs.  Hill also complained to other Wal-Mart officials via an e-mail the day after he was fired.  It is fair to say that, according to Hill, after he had complained about Bailey to Cameron on numerous prior occasions "in passing," Cameron asked him in about June 2007 whether he wanted to pursue a formal sexual harassment complaint against Bailey.  Hill declined, explaining to her he did not want Bailey to lose his job and that he, Hill, would rather just be transferred to another department to get away from Bailey.  Hill's failure at that time and thereafter to pursue a more formal harassment complaint against Bailey is relevant to whether and when Wal-Mart could be charged with knowledge of the harassment  and whether it can

25

thus be held liable as the employer, an issue addressed below.  However, Hill's testimony regarding

his complaints about Bailey does not establish as a matter of law that Hill did not subjectively view

Bailey's conduct as hostile or abusive.

Turning to Hill's statements that he did not have "a problem" with Bailey and asked for and

accepted rides from him, Hill testified in his deposition is as follows:

Q.      Did you ever ask [Bailey] for a ride home or get a ride home from [him]?

A.      Yes.

Q.      Okay.  How often?

A.      Every once in a while if my normal rides didn't work.  Because, like I say, I had no problem with him.  Sometimes he would tell me he was going somewhere on lunch and asked me if I wanted to go get something like McDonald's or whatever.  And I would ride with him over there and come back.  But that when, you know, I was – I always believe in giving people whenever they do wrong, a chance to correct themselves instead of just write people off.  But no matter how many opportunities, I can't ever – he just kept - -

Q.      When was the last time you went to lunch with [Bailey]?

A.      Well, we didn't, like, go to lunch.  We just went and got it, then we came back.  But –

Q.      Okay.  When was the last time that happened?

A.      I'm thinking 2006.

* * *

Q.      When was the last time you got a ride home with [Bailey]?

A.      Maybe early in 2007.

Q.      Okay.  You said you didn't have a problem getting a ride home with him despite some of the comments he made to you?

26

A.   No.  Because, like I said, you know, I always give people a chance to repair what they've damaged, you know.  You know, people can't fix stuff if you don't give them a chance ...

Q.   Did you ever feel like [Bailey] was serious in his advances towards you?

A.   Yes.

Q.   Okay.  Did you ever feel threatened by him?

A.   Not threatened like – no, I never felt threatened, you know.

(Pl. Dep. at 190-92).

Read in context, Hill's testimony can be reasonably interpreted to suggest that, while he found Bailey's conduct to be offensive, he was not afraid of him and was willing to give him a second chance, and that Hill, who does not have a car or drive, would rather accept a ride rather than have to walk home or to lunch.  Hill's "no problem" remark also can be reasonably viewed as referencing and further explicating a statement he had made several minutes earlier in his deposition, to the effect that he did not have "a problem" with a person being homosexual, generally speaking (*see id.* at 170), not as a statement that he did not consider Bailey's conduct towards him to be unobjectionable.  Hill's testimony that he accepted rides from Bailey and the "no problem" remark is relevant, as it mitigates the degree to which Hill might have subjectively perceived Bailey's conduct to be hostile or abusive.  In light of the ambiguity in the "no problem" remark and other evidence that Hill did find Bailey's conduct to be offensive, that Hill complained about it to Bailey and to other employees, and that Hill applied for a transfer to get away from Bailey, a finder of fact would not be foreclosed from accepting that Hill subjectively perceived Bailey's conduct to be sufficiently hostile or abusive.  *See Walker v. AMR Services Corp.*, 971 F. Supp. 110, 114 (E.D.N.Y. 1997) (holding that fact questions on plaintiff's subjective perception of hostility and

27

unwelcomeness existed so as to preclude summary judgment notwithstanding that plaintiff continued to accept rides home from her harasser and invited him to her house for a barbecue despite him having made offensive remarks); *cf. Cooke v. Stefani Management Services, Inc.*, 250 F.3d 564, 566 (7th Cir. 2001) (holding that a fact question existed on whether the plaintiff subjectively perceived the environment as hostile even though the plaintiff both once went on a social outing with a group of people that included the harassing supervisor and also wrote him a courteous personal note thanking him for a bottle of wine given as a gift).

### 3.   "Objectively" Severe or Pervasive

Wal-Mart also contends that a reasonable person in Hill's position would not have objectively viewed Bailey's harassment to have been sufficiently severe or pervasive to create a hostile or abusive working environment.  (Wal-Mart Summ. J. Brief at 15-16).  Here, Hill complains about two events that took place in 2004, while Bailey was still working in housewares.  In one, Bailey, dressed in full drag on Halloween night 2004, approached Hill in the break room and asked "in a womanly voice" if he "could eat with" Hill.  In the other, Bailey told Hill and several employees that he "could take about ten and a half inches of penis down his throat without gagging." The bulk of the harassment about which Hill complains, however, occurred while working alongside Bailey in the dairy department, from about November or December 2005 until mid-August 2007. During that approximately twenty-month period, Hill worked with Bailey about four times per week and, according to Hill, Bailey made repeated, sexually explicit homosexual comments and propositions "every single time" that they worked together, "turn[ing] every conversation and every sentence into something homosexual, just pretty much beat people over the head with it."  Hill's testimony further supports that Bailey would "constantly bother [him] with comments about having

sex with him or trying to convince [Hill] that there was nothing wrong with having sex with a man."

Bailey frequently couched sexual advances as graphic offers of "some backdoor pussy," and stated

on approximately twenty-five occasions that since "none of the women are giving [Hill] any pussy,

that [he] could have some of [Bailey's] leftovers."  He also once said, "If you like big titties, I've got

something at home in the closet," which Hill took as an allusion to fake breasts that Bailey had worn

while dressed in drag on the aforementioned Halloween.  Hill says that he told Bailey early on that

he did not want Bailey talking to him that way and that was not interested in having sex with men

but that Bailey continued to pursue him, telling him, for example, that "a hole is a hole" and that "it

gets wet like pussy."  In multiple instances Bailey asked Hill if he "was big like" a tube-shaped

container of cookie dough stocked in the dairy case, an inquiry about the size of Hill's genitalia.

Bailey once said to Cameron in front of Hill that Hill "needed a big dick up his ass."  In another

instance Bailey said to Hill that he "wanted to ride his train" in front of other employees.  One of

those employees was their immediate supervisor at the time, Daniels, who, rather than counseling

Bailey against such remarks, instead chimed in himself that Bailey "wanted to blow [Hill's] whistle."

Bailey also shared intimate details of his own life and personal hygiene in graphic terms, once telling

Hill that he, Bailey, had "masturbated ... with a dildo in the shower" one morning after they worked

together "because [Hill] had made him so hot," that he "uses vaginal cleanser to clean his anus"

because "he has to keep it clean like a pussy."  Bailey also said in reference to oral sex that "not all

mouths feel the same."  Bailey also once proposed to Hill, Williams, and Davis a wager in which

Hill, while blindfolded, would attempt to feel "the difference" between the unclothed "butts" of

Bailey and Williams and identify whose was whose.

29

The court concludes that the evidence is sufficient to create a genuine issue of material fact regarding whether Bailey's harassment was sufficiently severe or pervasive enough to be actionable under Title VII.[7]   Given Hill's testimony that Bailey constantly made unwanted homosexual comments and advances every single time they worked together in the dairy department, about four nights per week for about twenty months, a fact finder could reasonably find that the harassment at issue here was very frequent, to the point of constituting a pervasive pattern extending over a significant period of time, despite requests by Hill for Bailey to cease.  Further, Bailey's alleged remarks and advances were also so highly graphic, offensive, and unambiguously sexual in nature that a finder of fact could also accept that the harassment was at least moderately severe in terms of its objective tendency to offend, abuse, and embarrass, if not humiliate.

Wal-Mart argues that the conduct cannot be viewed as severe or humiliating because Hill admits both that he did not feel threatened by Bailey and that Bailey did not attempt to touch him inappropriately.  It is, of course, true that whether alleged harassment included unwanted physical contact or would be construed as physically threatening or intimidating are among the totality of the

---

[7]   Hill has alleged that he was sexually harassed not only by Bailey's homosexual remarks and advances but also by other sexual remarks and conduct by his female co-workers Williams and Wyatt.  There are significant questions with regard to whether actions by Williams or Wyatt actually "count" towards the establishment of a hostile environment and, if so, what potential impact they might have had on the environment.  Much of Williams' conduct appears to have been more than welcomed and invited by Hill, at least for a certain amount of time.  Even later hostility between Hill and Williams seems to have been based primarily upon personal animosity rather than upon Hill's gender.  *See generally McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) ("Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII.").  Further, Hill's primary complaint about Williams seems to be that she complained to management that he was sexually harassing her, which resulted in Wal-Mart instructing Hill to stay away from her.  Although Hill suggests that Williams's fear was not genuine, he does not dispute that she did complain to management about him, and he offers no evidence to suggest that Wal-Mart's action was anything other a good-faith cautionary response.  Likewise, the interaction between Wyatt and Hill is little more than petty slights of a primarily personal nature, about which Hill does not appear to have complained to anyone in authority.  Ultimately, however, because the evidence related to Bailey's conduct is itself sufficient to support a hostile environment claim, it is not necessary to determine the potential impact of the conduct of Williams or Wyatt on the workplace environment.

circumstances considered in assessing whether harassment is sufficiently severe or pervasive to be actionable. *See generally Harris*, 510 U.S. at 23 (directing courts to consider whether harassment "is physically threatening or humiliating, or a mere offensive utterance"). However, neither circumstance is a *sine qua non* of a sexual harassment hostile environment claim. *See Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008) ("[a] worker need not be propositioned, touched offensively, or harassed by sexual innuendo in order to have been sexually harassed." (quoting *Quick v. Donaldson Co.*, 90 F.3d 1372, 1379 (8th Cir. 1996) (internal quotation marks omitted)). Indeed, the Eleventh Circuit's recent en banc decision in *Reeves* demonstrates that evidence may be sufficient to support a hostile environment claim based only on sexually hostile or abusive verbal statements, if pervasive and offensive enough. *See* 594 F.3d at 812-14.

Wal-Mart similarly argues that Hill cannot prevail because he "never claims that Bailey's alleged comments impacted [his] ability to perform his job." (Wal-Mart Summ. J. Brief at 17). Wal-Mart seems to maintain that such effects are an element of Hill's claim. There is at least some evidence that Bailey's harassment may have had some tangible effect on Hill's job. Specifically, Hill claims that when he rebuffed Bailey's advances or showed affection to or interest in female employees or customers, Bailey would act jealous and lodge complaints about Hill to their supervisors, and, as a result, Hill says, those supervisors would at times criticize Hill's work, albeit only verbally and informally, based on Bailey's word, or they would at times direct Hill to undertake additional job tasks, such as stocking products that had normally been Bailey's responsibility. If it is assumed both that these actions of supervisors cannot be linked to Bailey's discriminatory animus, *see generally Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (discussing "cat's paw" liability), and that Hill has not shown that Bailey's conduct actually hindered

his ability to do his job, the alleged harassment is sufficiently severe or pervasive to support a Title VII claim.  "The Supreme Court has cautioned that harassment need not be shown to be so extreme that it produces tangible effects on job performance in order to be actionable." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1277 (11th Cir. 2002) (citing *Harris*, 510 U.S. at 22)).  Rather, whether harassment interfered with a plaintiff's job performance is merely one circumstance to be considered.  *See id.; Mendoza*, 195 F.3d at 1246.

In assessing the totality of the circumstances, evidence relating to certain factors may compensate for and overcome an absence of evidence or a lesser showing on others, creating a sort of sliding scale in which "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) (citing *King v. Board of Regents of Univ. of Wisconsin Syst.*, 898 F.2d 533, 537 (7th Cir. 1990)).  As such, a few extremely serious incidents may be enough, *see Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) ("A recurring point in [our] opinions is that simple teasing, offhand comments, and isolated incidents (*unless extremely serious*) will not amount to discriminatory changes in the 'terms and conditions of employment.' "(citation and internal quotation marks omitted) (emphasis added)), while, at the other end of the spectrum, "[f]requent incident of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists." *Lauderdale v. Texas Dep't of Crim. Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007); *see also, e.g., Reeves*, 594 F.3d at 813-14 (sexually hostile and offensive verbal remarks and epithets alleged to have occurred "on a daily basis" for over two years held sufficient, even where the plaintiff was not herself personally called a gender-specific slur).  In this case, the high frequency and consistency of

the conduct over a significant period of time, combined with the highly offensive and sexually graphic and unambiguous nature of the remarks and advances, are together sufficient to give rise to an issue of fact on whether the environment was objectively hostile or abusive for purposes of Title VII.  *See Bailey v. Runyon*, 167 F.3d 466, 469 (8th Cir. 1999) (holding that, even setting aside a later incident of inappropriate touching, the male plaintiff's allegations that male co-employee "constantly sexually harassed" him by asking to "perform sex on [him] and partake in other sexual activities" three to four times per week over a period of about six months, persisting after the plaintiff told the harasser that he was not interested nor homosexual, were sufficient to support existence of sexually hostile work environment); *Smith v. Pefanis*, 652 F. Supp. 2d 1308, 1327-31 (N.D. Ga. 2009); *Reeves, supra*; *see also Olson v. Lowe's Home Centers Inc.*, 130 Fed. Appx. 380, 388-389 (11th Cir. May 4, 2005) (unpublished); *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1035 (9th Cir. 2005).

Wal-Mart contends that "the Eleventh Circuit has repeatedly found conduct much more egregious than that alleged by [Hill] insufficient to create a hostile environment."  (*Id.* at 16).  In support of that proposition, however, Wal-Mart cites only two cases, *Mendoza*, *supra*, and *Mitchell v. Pope*, 189 Fed. Appx. 911 (11th Cir. 2006) (per curiam) (unpublished).  With regard to the former, the conduct alleged in *Mendoza* is not more egregious than that alleged here.  In *Mendoza*, the Eleventh Circuit held that the female plaintiff failed to establish an objectively hostile or abuse work environment because of sex based on the following conduct by her male supervisor, occurring over an eleven month period: (1) he said that was "getting fired up" to the plaintiff; (2) rubbed his hip against her hip while smiling and touching her shoulder; (3) twice made a sniffing sound while looking at her groin area; and (4) "constantly" followed employee and stared at her "in a very

33

obvious manner." *Mendoza*, 195 F.3d at 1247-49.  The conduct here is substantially more frequent,

voluminous, and explicit; substantially less ambiguous in terms of its sexual and offensive nature

on the whole; and occurred over a longer period of time.

In *Mitchell*, the court summarized the harassment, alleged to have been perpetrated by

Overbey, the plaintiff's supervisor in a Georgia County Sheriff's Department, over a three-and-a-half

year period, as follows:

> Plaintiff contends that Overbey: (1) tried to kiss her after the 1999 Sheriff's
> Department Christmas party and called her a "frigid bitch" when she refused, (2)
> showed up at places Plaintiff was "staking out" in December 1999 and told her "you
> must be working out" and "you sure do look fine," (3) appeared several times in her
> driveway in January 2000, once drunk, when he told Plaintiff's son that he loved
> Plaintiff, (4) suggested she wear certain jeans and commented "your ass sure does
> look fine," (5) told her "you can just walk into the room and I'd get an erection," (6)
> stood on his tiptoes to look down her shirt, (7) rubbed up against her, whispered in
> her ear, and put his arm across her chest, (8) chased her around the CID office, (9)
> once picked her up over his head in the CID office, (10) asked her over the Sheriff's
> Department telephones if she was dressed or naked, (11) opened the door to the
> women's bathroom and turned the lights off and on when Plaintiff was inside, (12)
> simulated "humping" another female employee with that employee's consent, (13)
> made sexually derogatory remarks and gestures about a female magistrate judge, and
> (14) referred to Sheriff Pope as a "big eared pencil dick motherfucker."  In March
> 2000, Plaintiff and Overbey attended a conference in Alabama.  Overbey told
> Plaintiff that the hotel had made a mistake and that they would have to share a room.
> Overbey slept on the floor.  The next night, after Overbey got his own room, he tried
> to convince Plaintiff to go to the hotel hot tub with him and other conventioneers.
> He called her a "frigid bitch" when she refused; when she confronted him the next
> morning and threatened to tell the Sheriff if Overbey did not leave the conference,
> Overbey cried, promised he would be "good," and left.  And Plaintiff explained that,
> in June 2002, before she was scheduled to work security at a private golf tournament
> given by a strip club owner, Overbey told her and other officers about another golf
> tournament hosted by this owner where strippers acted as caddies.  Overbey said that
> the owner directed the strippers to place golf balls into their vaginas and to squirt
> them onto the green.

*Id.*, 189 Fed. Appx. at 913 n.3.  Analyzing the conduct, the court concluded that it was "not that

frequent." *Id.* at 913.  The court also noted that "most" of it involved "offensive utterances" and that

there were "only" three instances of actual or attempted touching: when Overbey tried to kiss the plaintiff, when he lifted her over his head, and when he rubbed up against her and reached across her chest. *Id.* The court also stated that the "Plaintiff did not assert that she felt threatened by Overbey's conduct," *id.* at 913, and that "no evidence that Overbey's behavior unreasonably interfered with Plaintiff's job performance." *Id.* at 914. In addition, the court said, "much of Overbey's conduct involved horseplay" and "some was not sex-based," although the court did not identify what particular conduct supposedly fell into either category. *Id.* at 913. Ultimately the court held, "Although Overbey's reprehensible behavior only can be described as crass and juvenile, we accept that this behavior-given its relative infrequency-is not the kind of 'severe' harassment necessary for liability to attach under Title VII." *Id.* at 913-14.

Although the *Mitchell* court analogized the facts of that case to those of *Mendoza*, where the Eleventh Circuit suggested that it was "polic[ing] the baseline" of what constitutes actionable harassment, 195 F.3d at 1244 (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 158, 164 n. 8 (5th Cir. 1999)), it would appear that the harassment in *Mitchell* is more egregious and less ambiguous than in *Mendoza*. Of course, because *Mitchell* appears only in the Federal Appendix, it not binding. *See* 11th Cir. R. 36-2 (("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."); *HR Acquisition I Corp. v. Twin City Fire Ins. Co.*, 547 F.3d 1309, 1318 n.10 (11th Cir. 2008). Further, in the four years since it was decided, *Mitchell* has not been cited by the Eleventh Circuit or any other federal court of appeals in any opinion appearing in either the Federal Reporter or the Federal Appendix. Commentators have also harshly criticized both the analysis and result reached *Mitchell*. *See* E. Keller & J. Tracy, *Hidden in Plain Sight: Achieving More Just Results in Hostile Environment Sexual Harassment Cases by Re-*

*Examining Supreme Court Precedent*, Duke J. Gender L. & Pol'y 247, 261-64 (Jan. 2008); Y. Tamayo, *Rhymes with Rich: Power, Law, and the Bitch*, 21 St. Thomas L. Rev. 281, 294-297 (Winter 2009).  Even so, *Mitchell* is distinguishable, principally because the harassing conduct in the case *sub judice* is substantially more frequent and pervasive, having allegedly occurred every single shift that Hill worked with Bailey, about four nights per week for over a year and a half.

The conduct here is similar in some respects to a case now pending before the Eleventh Circuit.  In *Corbitt v. Home Depot USA, Inc.*, two male plaintiffs who each managed a separate Home Depot store claimed that they were subjected to a hostile work environment by a homosexual male human resource manager, Cavaluzzi, over the course of about a nine-month period after he was transferred to their district.  589 F.3d 1136, 1143-44 (11th Cir. 2009).  Much of the alleged harassment was comprised of telephone calls by Cavaluzzi to each plaintiff at his store, ranging from between two to three times per week to twelve times per week.  *Id.* at 1144.  On those occasions, Cavaluzzi would make sexual and otherwise personal remarks, ranging from compliments on each plaintiff's appearance to more express statements of sexual interest and invitations for drinks to suggestions to visit gay pornographic websites.  *Id.*  In addition, the plaintiffs asserted that when they saw Cavaluzzi at a number of district meetings and at a new store opening, he subjected them to unwanted touching on multiple occasions that including full body hugs, neck and shoulder messages, touches on the legs, and playing with their hair.  *Id.* at 1144-45.  After the district court granted summary judgment to the employer, 2008 WL 616057 (S.D. Ala. Mar. 3, 2008) (unpublished), the plaintiffs appealed, arguing that the district court had erred in holding, among other things, that the harassing conduct was not objectively severe or pervasive enough to be actionable.  Last year, the Eleventh Circuit, in a two-to-one decision, initially affirmed the district court's judgment as it

36

pertained to the hostile environment claims. *Corbitt v. Home Depot USA, Inc.*, 573 F.3d 1223, 1240-42 (11th Cir. 2009). That opinion was later vacated and superseded in December, 2009, by another two-to-one opinion that also affirmed the judgment for the employer on the sexual harassment claims. 589 F.3d 1136, 1153-56 (11th Cir. 2009). That opinion was, in turn, vacated on March 10, 2010, when the Eleventh Circuit agreed to rehear the case *en banc*. 598 F.3d 1259 (11th Cir. 2010). A final decision in the case has yet to issue.

In some respects, the alleged harassment in *Corbitt* is more severe than here, insofar as the plaintiffs there allege multiple instances of unwanted touching, while Hill makes no such allegations against Bailey. Also, the harasser in *Corbitt* was a supervisor while Hill and Bailey are co-workers. *See Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1248 (11th Cir. 2004) (harasser's status as a supervisor is a factor to be considered in the totality of the circumstances in assessing whether harassment is actionable); *see also Faragher*, 524 U.S. at 803. However, even assuming that the reasoning of the *Corbitt* panel majority is ultimately adopted by the *en banc* majority, such does not necessarily imply that Hill's claims are likewise due to be dismissed. This conclusion is based upon a number of differences supporting that the harassment of Hill was more actually severe or pervasive on the whole, based upon the totality of the circumstances. First, although Cavaluzzi engaged in unwanted touching a number of times in *Corbitt*, it was not particularly frequent, as Cavaluzzi did not work with the plaintiffs on a day-to-day basis. Also, the instances of hugging, neck and shoulder messages, and brief touches on the head, knees, and thighs the *Corbitt* plaintiffs describe are objectively less threatening and egregious than touching that has occurred in other cases. *See, e.g., Hulsey,* 367 F.3d at 1248 (conduct included repeated attempts by harasser to touch the plaintiff's breasts, place his hands down her pants, and pull off her pants, and to enlist the assistance of others

37

to hold the plaintiff while he attempted to grope her); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1299 (11th Cir. 2001) (sexual assault); *EEOC v. Dillard's Inc.*, 2009 WL 789976 (M.D. Fla. March 23, 2009) (unpublished) (male harasser came up behind the male plaintiff while the latter was urinating and reached around and touched his genitalia).  While periodic episodes of unwanted, unnecessary touching described in *Corbitt* are both objectionable and legally significant, they are not likely severe or pervasive enough standing alone to establish a hostile environment without additional evidence going to establish greater frequency of harassment.  Second, while the alleged harassment of Hill did not involve touching, it was substantially more frequent and pervasive, allegedly occurring every single time he worked with Bailey, about four times per week, making it more analogous to *Reeves*.  In this same vein, to the extent that there were additional harassing remarks in *Corbitt* going towards establishing greater "frequency," they were made for the most part over the telephone, mitigating their impact to some degree, rather than in person, as occurred here. *See Corbitt*, 589 F.3d at 1155 ("Comments during phone calls, rather than physical touchings, comprise most of the complained-of conduct. ...  The conduct in *Mendoza* included an instance of a coworker looking at the plaintiff's groin area and sniffing, which is probably more severe and certainly more humiliating than Cavaluzzi's comments, especially when considering Cavaluzzi made the comments during phone conversations, when he had no ability to touch the listener or otherwise engage in offensive behavior.") Third, many of the complained-of comments in *Corbitt* amount to compliments about the plaintiffs' appearance and are not sexually explicit.  It might be fair to say, as did the *Corbitt* dissent, that the majority there seemed too quick to take such remarks out of context and deem them to be either entirely or mostly innocuous and that a finder of fact would be entitled to find them *all* to be unwanted sexual come-ons of one stripe or another.  *See Corbitt*, 589

38

F.3d at 1170-75 (Fawcett, J., dissenting).   The remarks allegedly made here by Bailey were substantially more sexually explicit, graphic, offensive, in addition to being more frequent.   Finally, while Hill states in his EEOC charge that he advised Bailey early on that his remarks were unwelcome, there appears to have been some period that the *Corbitt* plaintiffs did not expressly object to Cavaluzzi's remarks or touching and make clear that his they considered his advances entirely unwelcome.   *See id.*, 589 F.3d at 1145 ("Corbitt did not feel that he had to specifically tell Cavaluzzi to stop touching him because Cavaluzzi was his superior and should have known that this was wrong.")   *Corbitt* does not govern the outcome of Hill's hostile environment claim, even if *Corbitt* panel majority's reasoning and result is ultimately adopted by the *en banc* court.

### 4.        Employer Liability

In its final argument in support of summary judgment on the claim, Wal-Mart argues that Hill cannot establish a basis for holding Wal-Mart liable for the harassment.   When the perpetrator of the harassment is a co-employee of the victim, rather than a supervisor, the employer is liable "if it knew or should have known of the harassing conduct but failed to take prompt remedial action."   *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007) (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002)).   "When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established."   *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003); *see also Breda v. Wolf Camera & Video*, 222 F.3d 886, 889-90 (11th Cir. 2000).   Constructive notice will be found where the harassment was so severe and pervasive that management should have known of it."   *Miller*, 277 F.3d at 1278.

Wal-Mart argues that the evidence shows that it had no knowledge of the harassment and thus cannot be liable.  Wal-Mart emphasizes that Hill was aware of the company's Open Door policy and that he actually used it to complain about "alleged favoritism" shown to Bailey.  (Wal-Mart Summ. J. Brief at 18).  That is, Wal-Mart acknowledges that Hill "regularly complained to his supervisors that Bailey was manipulating management to his advantage and that managers like Bailey better than [him]."  (*Id.*)  "In his numerous conversations with his supervisors, however," Wal-Mart posits, Hill "never once complained that Bailey acted inappropriately towards him or that [he, Hill] felt that he was being subjected to harassment by Bailey."  (*Id.*)

Hill stated in his deposition, though, that he did, in fact, make a number of complaints to supervisors about Bailey making sexual statements and advances towards him.  In particular, Hill says that he complained to Luther Daniels and on a number of occasions to Caprice Cameron, both of whom were assistant store managers that Hill was authorized to contact under the Open Door Policy.[8]  Hill says that he told Daniels that while Bailey's "expressions of his homosexuality was (sic) just general" when speaking to other employees, Bailey would, when speaking with Hill, "be very specific in his statements," that is, "talk[ing] about stuff he wanted to do with me ... as far as having sex or anything like that."  (*Id.* at 176).  Hill further alleges that Bailey had made "a lot" of his sexual comments "in front of everybody," including Daniels.  (*Id.* at 177).  One such instance that Hill recalls occurred when Bailey had said that he "wanted to ride [Hill's] train," whereupon Daniels

---

[8]    Hill also alleges that sometime in 2005 he told Stephen Hobbs, a store assistant manager, about Bailey being "overly expressive in his homosexuality."  (*Id.* at 170-71).  However, such a statement is too vague and failed to advise Hobbs of the scope and precise nature of Bailey's conduct or that Hill believed he was being sexually harassed for purposes of establishing knowledge on the part of the employer.  *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300-01 (11th Cir. 2000) (statement to a supervisor that harasser's behavior "made me sick" insufficient); *Miller*, 277 F.3d at 1278 (generalized comment to a supervisor "to tell [the harasser] he need to watch what he says to me," did not provide actual notice).

was not only present but also participated in the harassment by adding that Bailey "wanted to blow [Hill's] whistle." (*Id.* at 177). Hill says that when he complained to Daniels, he responded that Bailey was "only playing around" and "joking" and that Hill "shouldn't take him seriously." (*Id.* at 176). Wal-Mart discounts Hill's testimony regarding his complaint to Daniels and ignores Hill's statements indicating that Daniels was himself present for many of Bailey's comments and went so far as to himself tease Hill that Bailey wanted to "blow his whistle." There are no "magic words" that a plaintiff must use in order to indicate that he or she believes that she is the victim of unlawful discrimination. Viewed in the light most favorable to Hill, the evidence reasonably supports that Daniels had knowledge that Bailey had made statements to Hill indicating that Bailey desired to perform homosexual acts specifically with or upon Hill and that Hill considered such advances unwelcome and made him uncomfortable.

In addition, Hill claims that he also complained to Cameron about how Bailey "would constantly bother [him] with comments about having sex with him or try[] to convince [him] there's nothing wrong with having sex with a man." (Pl. Dep. at 184). Hill says he made such complaints to Cameron "in passing" on the store floor "several times" between 2005 and 2007 (*id.* at 185-86). Hill also relates that Bailey was actually speaking directly to Cameron on the occasion when he stated that Hill "need a big dick up [his] ass." (*Id.* at 184). Hill suggests that he also made a more "official complaint" to Cameron in a store office in June 2007, at which time he asked her for advice about how to handle the situation with Bailey. (*Id.* at 186). She responded by asking Hill if he wanted to file a sexual harassment complaint. (*Id.*) Wal-Mart emphasizes that Hill said that although he had issues with Bailey, he did not want him to lose his job, so he asked if he, Hill, could be transferred to another department at the store so that he would not have to work around Bailey.

(*Id.*)  Based on Hill's failure to further pursue a formal sexual harassment complaint after June 2007,

Wal-Mart argues that Wal-Mart cannot be deemed to have knowledge of Bailey harassment.  But

even setting that later complaint aside, Wal-Mart does not explain why it could not be deemed to

have acquired knowledge of Bailey's harassment based upon Hill's earlier multiple "informal"

complaints to Cameron, particularly in conjunction with Bailey allegedly stating in front of Cameron

that Hill "needed a big dick up his ass."  The record here would allow a fact finder to determine that

Wal-Mart had actual knowledge of Bailey's harassment for purposes of establishing Wal-Mart's

direct liability. Wal-Mart's motion for summary judgment is due to be denied as it relates to Hill's

claim alleging a sexually hostile work environment.

### B.    Retaliation

Hill also asserts that Wal-Mart unlawfully retaliated against him.  At times, Hill seems to use

"retaliation" as a description for any action he perceives as having been taken against him unfairly.

However, "Title VII is not designed to make federal courts 'sit as a super-personnel department that

reexamines an entity's business decisions.'" *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244

(11th Cir. 2001) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991));

*see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997) (stressing that "federal

courts do not sit to second-guess the business judgment of employers").  No provision of Title VII

nor any other federal anti-discrimination law prevents employers or supervisors from making

employment decisions based simply on personal favoritism or animosity or for similar reasons that

might otherwise be thought "unfair" in a generic sense.  *See Chapman v. AI Transport*, 229 F.3d

1012, 1030 (11th Cir. 2000) (en banc) ("An employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a

[prohibited] discriminatory reason.") (internal marks and citation omitted); *Womack v. Runyon*, 147 F.3d 1298 (11th Cir. 1998) (per curiam) (male plaintiff failed to state a claim under Title VII based on allegations that he was passed over for promotion in favor of a woman with whom the employer's decisionmaker was involved in a sexual relationship); *Platner v. Cash & Thomas Contractors, Inc.*, 908 F.2d 902, 905-06 (11th Cir. 1990) (disparate treatment based upon nepotism is not actionable under Title VII).

In the context of federal employment law, "retaliation" is a term of art, a prohibited form of intentional discrimination whereby an employer subjects a person to certain injurious treatment specifically because he or she has engaged in some particular statutorily protected activity. Title VII's anti-retaliation provision thus forbids employer actions that "discriminate against" an employee (or job applicant) because he or she has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a); *see also Crawford v. Metropolitan Gov't of Nashville and Davidson*, 129 S. Ct. 846, 850 (2009); *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60 (2006). A plaintiff seeking to establish a Title VII retaliation claim has the burden to prove at trial that (1) he engaged in statutorily protected activity; (2) he thereafter suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). Where, as here, there are no statements by a decisionmaker or other direct evidence that the adverse action was motivated by a retaliatory animus, the plaintiff may attempt to establish causation by circumstantial evidence, implicating the

*McDonnell Douglas*[9] burden-shifting framework first established by the Supreme Court for use in discrimination cases.  *See Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).  At a minimum, such a circumstantial showing requires proof that the decisionmaker was aware of the protected activity at the time he took the adverse action.  *See Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999).  In the absence of statements or remarks by the decisionmaker constituting circumstantial evidence of a retaliatory animus, a showing of causation typically also requires there to exist a "very close" temporal proximity between the protected activity and the adverse action. *See Brown*, 597 F.3d at 1182-83.  Under the *McDonnell Douglas* framework,

> [o]nce a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and drops from the case.  After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions.

*Id.* at 1181-82.

There is sufficient evidence that Hill engaged in protected opposition under Title VII by virtue of his complaints to Daniels and Cameron regarding Bailey's sexual harassment.  Hill's termination qualifies an adverse employment action.  Hill also seems to suggest that the three prior disciplinary actions that were used by Wal-Mart to justify his ultimate termination under its progressive disciplinary policy were also motivated by retaliation.  Those disciplinary actions were as follows: (1) a verbal coaching on January 18, 2007 for failing to finish his work by leaving several "rocket carts in the freezer" and "continu[ing] to give less than 100% on a daily basis"; (2) a written

---

[9] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

coaching on March 24, 2007, whereupon Daniels wrote Hill up because he was allegedly "standing around talking to off the clock associates when he was warned previously"; and (3) a "Decision Day" coaching on June 5, 2007 by Cameron based upon Hill's failure to finish cleaning the dairy cooler. It is assumed for purposes of summary judgment that each of those formal disciplinary actions qualifies as an adverse employment action. *See generally Burlington Northern*, 548 U.S. at 68 (to support a retaliation claim under Title VII, it must be shown that "a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." (internal quotation marks and citation omitted)); *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (unfavorable performance review that affected eligibility for merit pay increase was adverse action for purposes of retaliation claim).

Hill cannot establish a causal link between his complaints of sexual harassment to Daniels and Cameron and his discharge. Store co-manager John Welsh claims that he made the decision to terminate Hill based upon his determination that Hill had used profanity on the sales floor, and Welsh denies being aware that Hill ever made complaints about sexual harassment by Bailey. (Welsh Decl. ¶¶ 7, 8). Hill points to no evidence to rebut either claim. Rather, Hill only argues that the temporal proximity between his final complaint to Cameron, made sometime in June 2007, and his termination that August is itself prima facie sufficient to suggest causation. However, temporal proximity alone cannot establish the requisite causal connection when there is unrebutted evidence that the decisionmaker was not aware of the protected activity. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1234-35 (11th Cir. 2010). Accordingly, Wal-Mart is entitled to summary judgment on Hill's retaliation claim to the extent that it is founded upon his discharge.

It is also not clear whether Hill can establish a causal connection between his complaints to Daniels and Cameron and the three disciplinary sanctions he received leading up to his discharge. Hill's testimony is not specific about when he made most of his complaints. The only sanction connected to a specific month appears to have been his final, more "official" complaint to Cameron, made sometime in June 2007. Even assuming that Hill could establish a prima facie case his retaliation claims, he fails to present sufficient evidence to rebut the legitimate reasons offered by Wal-Mart for any of the three prior disciplinary actions. He presents no evidence that the actions were merely a pretext for unlawful retaliation.

At the third and final stage of the *McDonnell Douglas* analysis, the question becomes whether the plaintiff can point to evidence sufficient to allow a finder of fact reasonably to conclude that the reasons offered by the employer are a pretext for unlawful retaliation. "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. However, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004). Nor does an employee establish pretext merely by questioning the wisdom of such a reason. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal anti-discrimination law] does not interfere.'" *Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000) (en banc) (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466,

1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted))).

The record indicates that Hill's first, "verbal coaching" in January 2007 was for leaving several "rocket carts in the freezer" and "continu[ing] to give less than 100% on a daily basis." Hill does not specifically dispute those allegations, but he claims that the coaching was actually motivated by the fact that he had somehow bruised his supervisor's ego earlier in the evening. But even accepting that his supervisor was so motivated in taking disciplinary action, such action would not constitute retaliation or discrimination prohibited under Title VII. *See Chapman; Elrod, supra.* The same is true with regard to his second, "written coaching" issued in March 2007. Daniels there wrote Hill up because he was allegedly "standing around talking to off the clock associates when he was warned previously." Daniels further stated, "[Hill's] performance is less than standard and needs to improve immediately." Hill acknowledged on the reprimand that he understood management's concerns pertaining to his job performance and that he would do his best to improve. Hill also admits in his deposition that he spoke "in passing" to an off-the-clock employee "for a minute" that night and that Daniels walked by them, but Hill denies that he "stop[ped working] for a long period of time just standing there conversating (sic)." Instead, Hill suggests, this was a "retaliatory write-up" that was actually motivated by the fact that Hill had embarrassed Kirkpatrick in front of two female trainees and other employees that same night. Again, however, Hill cannot show pretext by quarreling with the wisdom of the employer's decision. And while writing up an employee based upon personal animosity or a bruised ego might arguably be unfair, it is not unlawful retaliation or discrimination under Title VII.

Turning to Hill's Decision-Day write up on June 5, 2007, Hill acknowledges that he had not cleaned up the dairy cooler as charged by Cameron and also that he clocked out shortly before the end of his scheduled shift and that he did not respond when he was paged to the back of the store at that time.  It is not clear from the record whether this write-up occurred prior to Hill's more "official" complaint to Cameron.  Hill claims, however, that Cameron only wrote him up on that occasion because she feared that she might herself be yelled at by her own supervisor, store manager Phillip Jones.  Indeed, Hill suggests that Cameron actually told him that she wrote him up because Jones, "could have said something" if she didn't.  Ultimately, Hill merely quibbles with the wisdom and fairness of Cameron's decision.  Even if she did issue Hill the write-up because she was afraid that otherwise she might herself be reprimanded, such a motive does not implicate Title VII.  Wal-Mart is entitled to summary judgment on Hill's retaliation claims to the extent that they are based upon the three disciplinary actions that proceeded his discharge.

### C.     Race Discrimination

In his brief in opposition to Wal-Mart's motion for summary judgment, Hill also attempts to assert that Wal-Mart took action against him on the basis of race, in addition to his claims of sexual harassment and retaliation.  (Pl. Opp. Brief at 11-12, ¶ I).  Wal-Mart argues in its brief that Hill has not properly asserted race discrimination claims in this action and that Hill is due to be precluded from now attempting to pursue them.  The court agrees.

In his original complaint, Hill did assert that he was claiming to have been subject to discrimination on the basis of race.  However, the 12-page document that serves as his latest pleading, titled "Plaintiff's Response for a More Definite Statement" and filed  April 15, 2009, asserts claims only for "Same Sex Sexual Harassment,""Sexual Harassment,""Harassment,""Hostile

48

Work Environment" and "Retaliation." (Doc. 21). He does not allege therein that he was subjected to race discrimination. Likewise, Hill confirmed during his deposition that he was only attempting to pursue the claims alleged in what serves as his latest pleading, as follows:

> Q.    Okay. All right. In this lawsuit, I know there have been a couple of amended complaints. But as I read the last amended complaint, which I believe is titled Plaintiff's Response For A More Definite Statement, your claims in this lawsuit are for same sex sexual harassment, sexual harassment, harassment, hostile work environment, and retaliation; is that correct?
>
> A.    Yes.
>
> Q.    Okay. Are you making any other claims in this lawsuit?
>
> A.    Not at this time.

(Pl. Dep. at 116).

"As a general matter, '[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.'" *Pintando v. Miami-Dade Housing Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (quoting *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER*, 463 F.3d 1210, 1215 (11th Cir.2006) (citation and quotation omitted)). Accordingly, based upon the governing pleadings, Hill is no longer asserting race discrimination claims. Further, a plaintiff may not amend his complaint through argument in a brief opposing summary judgment. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Rather, to assert new claims, a plaintiff must file a proper amendment to the complaint pursuant to Rule 15 of the *Federal Rules of Civil Procedure*. The deadline to amend the pleadings has expired long ago, however. Nor would the court grant Hill leave to amend even if he asked. He expressly acknowledged in his deposition that he was continuing to pursue only the claims alleged in his pleading filed April 15, 2009. To

49

allow Hill to pursue other claims at this point would cause Wal-Mart to suffer substantial unfair prejudice and expense in the form of additional discovery and time spent.  Accordingly, Hill shall not be permitted to pursue any claims in this action based upon allegations of discrimination based on race.

## IV.    CONCLUSION

Based on the foregoing, Wal-Mart's motion for summary judgment (Doc. 44) is due to be GRANTED IN PART AND DENIED IN PART.  Specifically, Wal-Mart's motion is due to be granted as it relates to Hill's claims alleging that he was terminated and otherwise subjected to adverse action in retaliation for having engaged in protected activity under Title VII.  Accordingly, Hill's retaliation claims are due to be DISMISSED WITH PREJUDICE.  Wal-Mart's motion for summary judgment is due to be denied, however, as it relates to Hill's claim alleging that he was subjected to a hostile work environment because of sex, also in violation of Title VII.  A separate order will be entered.

As to the foregoing it is SO ORDERED this the 3rd day of August, 2010.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE