

FILED
2011 Jul-07  PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL DEWAYNE HILL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.    2:08-CV-1682-PWG |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 3, 2010, this court entered an order and memorandum of opinion granting in part and denying in part the motion of defendant Wal-Mart Stores, East, L.P. ("Wal-Mart") for summary judgment on the claims presented in the complaint filed *pro se* by Michael Dewayne Hill in the above-captioned civil action. (Doc. #56). The court found that Mr. Hill had raised only claims of same sex sexual harassment and retaliation in his amended complaint. The court further found that the claim that Mr. Hill had been discharged in retaliation for his complaints to the defendant's managers about the alleged same sex sexual harassment was foreclosed as a matter of law. The court concluded that there remained a genuine issue of material fact concerning whether Mr. Hill had been sexually harassed by Melvin "Wesley" Bailey as alleged in the complaint. *Id.* On June 6 and 7, 2011, the court conducted a non-jury trial on the remaining claim.[1] The court heard testimony from seventeen witnesses and considered all documents offered and admitted into evidence. Below are

---

1    Neither party requested a jury trial at any time during the pendency of this litigation.

findings of material fact and conclusions of law concerning the remaining claim.  This litigation is before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c) for final disposition.

### The Issue:  Same Sex Sexual Harassment - Hostile Work Environment

A pretrial order in this action notified the parties of the issue to be tried and in general terms the applicable standards of review. (Doc. #63).  The pretrial order identified two related factual questions.  The first was whether Mr. Hill had been subjected to same sex sexual harassment within the meaning of Title VII and, second, whether the harassed, Melvin "Wesley" Bailey, was, or could be deemed to have been, a "supervisor" within the meaning of Title VII jurisprudence.  The latter question arose from the *pro se* plaintiff's inchoate suggestion that the alleged harassed had such an influence on the defendant's actual employment decision makers that otherwise neutral employment actions were motivated by Bailey's allegedly unlawful discriminatory intent.

### Background Summary

Michael Hill was employed by the Wal-Mart Stores East, Homewood, Alabama, facility in May of 2003 until his termination in August 2007.  Throughout his employment with Wal-Mart, Mr. Hill worked as a stocker in the dairy department on the 10:00 p.m. to 7:00 a.m. overnight shift.  The dairy department employees were responsible for properly placing products on shelves, unloading trucks, cleaning and organizing the cooler, and ensuring that out-of-date dairy products were removed from the sales floor.  The Wal-Mart Store was divided into two business sections for food

and general merchandise.  The stock receiving areas for food and dairy deliveries were located physically close to each other.  The break room used by the dairy stockers was also used by those employed in other areas of the store.  The dairy department usually had a dairy supervisor and two or three associates to perform the tasks assigned.

The Wal-Mart Store was organized under a store manager and co-managers or assistant managers.  Neither the manager nor the co-managers routinely worked the overnight shift.  The store employed an overnight manager responsible for the night shift, an assistant overnight manager, and a supervisor for each department, including the dairy department.

While the employees on the overnight shift were assigned to different areas of the store, certain departments were in close proximity to each other.  For example, the grocery department associates performed such duties as shelf stocking, which at times put those associates near the dairy department.  Employees in departments other than the dairy department were also in contact with each other in common areas such as the receiving platform, break rooms, and other locations.

When Mr. Hill was first employed in 2003, Melvin "Wesley" Bailey was an associate in the housewares department of the store.  Bailey and Mr. Hill had only limited contact in the first year of Mr. Hill's employment, although there were occasions when they were in a break room or another common area at the same time.  It was widely known in the store that Mr. Bailey was a homosexual, and he did not conceal his sexual preferences.  He would occasionally refer to himself as a "sprinkle queen."  Bailey was also considered by the managers to be an excellent employee.  He was frequently praised by management for the quality of his work.  Mr. Bailey was an extrovert who frequently

3

drew attention to himself and, on some occasions, to his sexual orientation.  Bailey moved to the dairy department in 2006 after Veronica Neeley transferred to a different section of the store.

Michael Hill was an introverted young man when he came to Wal-Mart.  During his tenure at Wal-Mart Mr. Hill came to believe that his co-workers thought that he was homosexual because he did not discuss women or sex.  Mr. Hill was nervous around women, often dropping things when he was in their presence.  Mr. Hill knew he did not view sex in the same way he believed others did. At some point early in his employment he told his co-workers that he was a virgin.  He believed he was the only virgin at the store.  While extremely sensitive about women and discussions of sex, Mr. Hill also was known to have made female associates uncomfortable with his unwanted attention. Madoline Wyatt, an associate in the grocery department, was apprehensive around Mr. Hill because he frequently asked her for hugs.  Hill also admitted to leaving unwanted notes, poems, and flowers for Wyatt on the shelves where she stocked merchandise.  Hill would come into the grocery department unasked and stock Wyatt's freight merchandise.  He would often ask if he could buy her lunch.  She believed that Mr. Hill may have followed her home on a bus on one occasion.  Wyatt asked Hill a number of times to stop bothering her.  At one point she solicited other associates to ask Mr. Hill to leave her alone.  Toshiba Williams, an associate in the dairy department, actually made a formal complaint to management in 2007 that Mr. Hill was sexually harassing her.  Mr. Hill asked Ms. Williams for dates many times and, according to Williams, frequently discussed sex in the most explicit terms with her.  In one undisputed incident, Mr. Hill exposed his penis to Ms. Williams and Melvin Bailey in the dairy cooler.  Ms. Williams heard Mr. Hill discussing his encounter with a

prostitute.  Mr. Hill was introduced to the prostitute by a friend and co-employee before coming to work one night.  When he arrived at work Mr. Hill believed that most of his co-workers knew he had been taken to a prostitute.

In 2004, before Mr. Bailey became Mr. Hill's co-worker in the dairy department, he had approached Mr. Hill in a break room while dressed as a woman for Halloween and asked if he could eat lunch with him.  Mr. Hill later alleged that he was very uncomfortable with Bailey's behavior while in costume, though he did not complain to anyone at the time or until after his termination.  Mr. Hill also became convinced after the Halloween 2004 encounter that Bailey was "pursuing him."  After Bailey was transferred to the dairy department in 2006, he and Mr. Hill talked with each other numerous times, and some of those conversations related to homosexual sex.  While Mr. Hill appears to believe that he did not encourage Mr. Bailey in any way to talk about sex, he admitted that he willingly participated in these conversations with Mr. Bailey because he wanted to know more about homosexuals.  Hill argued with Bailey, for example, about differences between male and female sex.  Hill said that Bailey's contention that there was no difference between a man and a woman because "a hole is a hole" was wrong because they served "a different purpose or function."  Hill never reported these conversations to anyone and told no one that he found them offensive.

During his employment with Wal-Mart, Mr. Hill was disciplined or coached by more than one manager on several different occasions concerning the quality of his work and failing to stay in his assigned area of work.  He was cautioned for leaving out-of-date merchandise in the display case.  He was coached for talking to employees while off the clock after previous warnings.  He was

counseled for leaving carts in the freezer and for not giving a one hundred percent effort.  While Mr. Hill came to believe that it was Bailey who had gotten him in trouble, no manager nor even a co-employee ever said that Bailey had influenced a disciplinary decision related to Mr. Hill prior to August 2007.  It was widely known that prior to his termination Mr. Hill had been the subject of a "red book," the most formal level of investigation by Wal-Mart management, after Toshiba Williams made a complaint of sexual harassment.  At no time during any of his numerous coaching sessions or disciplinary meetings did Mr. Hill ever complain about sexual harassment or Mr. Bailey's comments in the workplace, nor did he state that he thought Bailey was trying to cause him disciplinary problems because he was pursuing Mr. Hill.

Sex was discussed during the work hours at Wal-Mart on the overnight shift.  At least some conversations included Mr. Bailey's comments about homosexual activity.  The discussion of sex did not appear to employees other than Hill to be at an unusual level for a workplace.  No one ever heard Mr. Bailey make any advance toward Mr. Hill nor suggest that he was attracted to Mr. Hill. Bailey did make crude comments from time to time, but no one other than Mr. Hill ever concluded that these comments were specifically intended for Mr. Hill.  The other employees dismissed these occasional comments as "Wesley being Wesley."  Several times in 2006 and 2007, Mr. Hill accepted rides home from Bailey, and he went to the home of Bailey's life partner of 18 years to pick up a washer and dryer.  He would occasionally ride in Bailey's car to bring lunch back to the other workers.  Mr. Hill never complained while working at Wal-Mart, nor did he state in his testimony that Bailey made any type of advance toward him during these times they were alone in Bailey's car.

By August 2007, Mr. Hill was in the final stages of disciplinary coaching when a customer complained about his use of profanity in the work place.  This was not the first such occurrence.  Mr. Hill had used profanity on earlier occasions; for example, he admitted to calling Ms. Wyatt a "bitch" or as "acting bitchy."  The final complaint came when a customer telephoned the regional office of Wal-Mart to complaint that a young black male associate on the night shift had used profane language.  The regional office required the store to investigate.  When approached by the manager about the complaint, Bailey confirmed that Hill had used profanity in front of a customer who became upset.  Bailey had apologized to the customer for Hill's conduct.  Bailey had not reported the incident earlier because he did not want Hill to be fired.  When managers met with Hill about the complaint two or three days before he was terminated, Mr. Hill did not claim that he had been harassed by Bailey.  Moreover, Mr. Hill did not specifically deny that he had used profanity.  Instead, Hill challenged the customer's ability to identify him by claiming that  he always kept his name tag in his pocket in violation of the dress code because he had lost so many of his name tags.  At a second meeting a few days later, Mr. Hill was terminated.  Once again he did not claim at the meeting that he had been sexually harassed, nor did he complain that Bailey had caused him to get in trouble.  Only after he was fired did Mr. Hill write a long email to Wal-Mart managers in which he complained about many aspects of his employment, including but not limited to complaints about Bailey's homosexual comments.  When the email was received, Wal-Mart assigned the human resources director to investigate Hill's claims.  Only days after the email was sent, the human

resources director telephoned Mr. Hill's home and apparently spoke to his mother.  The director left

his name and personal cell phone number and asked that Mr. Hill call him.  Mr. Hill never did so.

Summary Of the Plaintiff's Evidence

**Mary Ann Goree**

Ms. Goree, Mr. Hill's mother, testified that Mr. Hill was the primary source of income for

his family after they lost their home in 2003.  She said that she and Mr. Hill discussed each

"incident" Mr. Hill reported to her, but she did not say what the nature of these incidents may have

been.  She stated that Hill told her that he did not like the "forwardness of Melvin Bailey."  She also

said that she "saw the pain" and suggested that Mr. Hill quit.  She did not identify the source of the

"pain."  She did not indicate whether the pain was caused by Mr. Hill's numerous disciplinary

problems, his difficulties with Ms. Wyatt, the sexual harassment complaint of Ms. Williams, or the

embarrassing encounter with a prostitute arranged by his friend Shawn Davis.

**Phillip Jones**

Mr. Jones was the store manager during Mr. Hill's employment.  He learned of a customer

complaint about a young black male associate using profanity in the store from a report of the

complaint through the regional office.  The customer had contacted the regional office, which in turn

notified Jones.  Jones turned the matter over to the assistant manager and the overnight manager.

When asked about the complaint, Melvin Bailey confirmed the incident had taken place and

identified Mr. Hill.  Mr. Jones stated that he had earlier opened a formal "red book" investigation concerning the sexual harassment complaint made by Ms. Williams against Mr. Hill.  He stated that her claims could not be verified.  Jones explained that Wal-Mart maintained a widely distributed and comprehensive open door policy which allows for any employee to report sexual harassment or other acts of discrimination to any level of management at any time.  The policy was in effect during Mr. Hill's tenure.  Jones could not recall ever receiving a complaint from Mr. Hill, or that such a complaint was reported to have been made.

**John Walsh**

Mr. Walsh was the co-manager.  He was directly involved in the decision to terminate Mr. Hill.  Walsh had received complaints about Mr. Hill on other occasions and knew Hill to be in the final stage of discipline.  When an investigation found proof of Mr. Hill's use of profanity as reported by the customer, the decision was made to terminate him.

Mr. Walsh confirmed the expansive open door policy and that sexual harassment would not be tolerated by the company.  Walsh never talked to Bailey about Hill.  He testified that Bailey had never initiated a report which led to discipline for Mr. Hill.  He also testified that Hill had never complained to him or, to his knowledge, to anyone else about Bailey.

**Luther Daniels**

Luther Daniels was the overnight manager responsible for supervising, among others, the dairy department.  Daniels knew Bailey to be a hardworking associate.  He had observed Bailey and had seen that he was polite to customers and coworkers.  He testified that on occasion Bailey had used profanity.  Daniels could not recall Bailey ever discussing sex, nor had he ever seen Bailey act inappropriately.  Daniels said that Bailey sometimes mentioned that Hill was hurting production and roaming around the store.  He stated that he never disciplined Hill because of anything Bailey told him.  Daniels knew that Toshiba Williams was afraid of Mr. Hill and had reported that he was harassing her.  Williams reported to Daniels that Hill had obtained her telephone number and was calling her.  Daniels told Hill to stay away from Williams.  At one point after this warning, Hill was in the store while not scheduled to work, and Daniels told him not to go back to the dairy department where Ms. Williams was working.  Daniels had personally observed Hill out of his area of responsibility during work hours on at least two occasions.  Daniels stated that no information he had received from Bailey caused Hill to receive coaching or any other form of discipline.  Hill never complained to Daniels about Mr. Bailey.

**Harold Kirkpatrick**

Mr. Kirkpatrick was assistant overnight manager.  He had received complaints from Ms. Wyatt that Mr. Hill was intimidating her with his unwanted attention.  As a supervisor, Kirkpatrick had counseled Hill about his work behavior and productivity on more than one occasion.  Hill never

complained to Kirkpatrick about Bailey during these sessions.  Mr. Kirkpatrick testified that none of the coaching of Mr. Hill was based upon anything learned from Mr. Bailey.  The assistant manager never overheard any discussion of sex in the workplace.  Kirkpatrick left the store in May before Hill was fired in August of 2007.

**Madoline Wyatt**

Ms. Wyatt worked as a grocery stocker while Mr. Hill was employed in the dairy department. She would see Hill at the time clock.   Hill would ask her for hugs, and she would refuse.  Hill started leaving her notes, flowers, and poems in her shelf stocking area, which was well away from the dairy department.  On occasion Hill would leave the dairy department to come into her area and put up her stock without being asked.  Wyatt told Hill "numerous times" to leave her alone.  She had observed Hill following female customers around the store.  Ms. Wyatt became visibly upset when recalling seeing Hill on the bus with her on her way home one day.  She was told by many people that Hill once called her a "bitch" or that she was "acting bitchy."  She asked other employees in the store to tell Hill to leave her alone.  Finally, Hill was told by a manager that he could lose his job if he did not leave Wyatt alone.

Wyatt never heard any inappropriate comments from Bailey to Hill, nor did she hear Hill complain about unwanted attention from Bailey.

**Toshiba Williams**

Ms. Williams was a dairy associate working the overnight shift with Mr. Hill.  She no longer

works at Wal-Mart.  While at the store she heard Hill discuss sex on many occasions and use

profanity "several times."  She testified that she believed Mr. Hill to be "mentally off."  She said that

she felt threatened by him.  Hill had sometimes claimed to coworkers that he and Williams had been

"intimate," which she vigorously denied.  Hill had asked her out "many many times," but Williams

always refused.  She complained to Caprice Cameron, Luther Daniels, and Harold Kirkpatrick about

Hill.  She once heard Hill call her a "bitch."

On one occasion when Williams and Bailey were stocking the dairy counter, Hill claimed

that his penis was as large as a roll of cookie dough.  When Bailey and Williams went into the

cooler, Hill followed them and exposed himself.  Williams testified that, until she finally made the

sexual harassment complaint, she and other employees said little about Hill's conduct because they

did not want him fired because they were all aware of his financial situation.

**Melvin Bailey**

Mr. Bailey testified that he had never asked Hill for sex nor indicated that he was sexually

interested in him.  Bailey said that he had given Hill rides home, and that Hill and his brother had

come to the home of Bailey and his partner of eighteen years to pick up a washer an dryer.  He

acknowledged that he had reported to Ms. Wyatt that Hill had called her a "bitch."  He said that Hill

had volunteered to his coworkers that he was a virgin.  Bailey testified that he had overheard a

number of statements made by Hill about sex in general, and specifically concerning Williams, Wyatt, and Caprice Cameron.  Bailey said that on one occasion while he was in the dairy cooler with Ms. Williams, Hill exposed his penis to them.  Bailey testified that they did not report the exposure immediately because they did not want Hill to lose his job because they felt sorry for him.  Bailey said he never made a pass at Hill or expressed any sexual interest in him.  Bailey acknowledged Wal-Mart's extensive anti-harassment policy and online training associates were required to complete.

Bailey recalled that on one occasion a customer overheard Hill use profanity.  The customer complained in front of Bailey, who apologized for Hill's conduct.  The customer said "I didn't know Wal-Mart employees talked like that."  Bailey did not report the incident to management, but later was asked about it during an investigation of the customer's complaint and confirmed that it had occurred.  He was required to write a statement about the incident in front of Phillip Jones and Caprice Cameron.  Bailey said that other than the occasion when managers came to him about Hill, he had not been involved in any write-up Mr. Hill had received.


**Gary Fuller**

Mr. Fuller is the Regional Human Resources Manager for Wal-Mart Stores, East.  On August 10, 2007, he received a telephone call from Michael Hill in which Hill told him he had a meeting with management upcoming and that he expected to be fired.  Fuller told Hill not to listen to rumors and go to the meeting.  During this call Hill did not complain to Fuller about Bailey, nor did he make any claim of harassment.  After Hill was fired, Fuller received a copy of Hill's email

which contained, among many other complaints, his allegations that Bailey had made unwelcome sexual comments.  Fuller stated there had been no previous complaint, but that, because the open door policy includes complaints by former employees, an official "red book" investigation of Hill's allegations was initiated.  As part of that investigation, Fuller himself called the contact number for Hill and left a message for Hill to call him.  Hill never called Fuller.

Fuller explained that multiple sources of information are placed throughout the store intended to ensure that all employees know of Wal-Mart's anti-discrimination policies and the numerous ways in which complaints could be made.  His personal cell phone number has always been on the notices.  Fuller stated that the anti-retaliation policy was equally widely disseminated.  He testified that there was no record of any complaint by Mr. Hill until after he was fired.


**Caprice Cameron**

Ms. Cameron was fired by Wal-Mart for theft of property sometime after Mr. Hill was terminated.  She was the dairy supervisor during Hill's employment.  She testified that, while sex was discussed on occasion, it was no more frequent on the overnight shift than on any other shift or, indeed, than at any other store.  She referred to talk of sex as taking place "every now and then."  She said that she heard both Hill and Bailey talk about sex, but no more than anyone else.  She never saw any indication that Bailey was attracted to Hill.  She said that Hill was never disciplined because of something reported by Melvin Bailey.  Cameron was aware of the complaints by Wyatt and Williams.

On one occasion when Cameron, Hill, and Bailey were working together, Bailey made a crude comment Hill did not like.  Hill, Cameron, and Bailey were stocking shelves and Hill was complaining.  Cameron was in between Bailey and Hill.  Bailey said, "What he needs is a big dick up his ass."  Cameron asked Hill if he had heard the comment and, when Hill said "no," Cameron repeated it.  Later Hill said something to Cameron about the remark.  Cameron asked Hill if he wanted to make a sexual harassment complaint, and Hill said "no."

**Sesaley Washington**

Ms. Washington was employed at Wal-Mart on the 4:00 a.m. to 1:00 p.m. shift near the dairy department.  She heard Bailey make jokes about being gay.  She said that Wesley was playful and jokingly "said some stuff."  She could not remember anything Bailey had said specifically, but that his jokes "were not offensive."  She never heard Bailey complain to management about Hill's work or use of profanity.  She never heard Bailey say that he was attracted to Mr. Hill.  She never heard Hill complain about Bailey.

**Carl Spencer**

Mr. Spencer worked as an overnight stocker in the grocery department.  He said that on occasion he would hear people using profanity in the dairy department and that there were some sexual discussions.  He testified that such talk "came up from time to time," but was not an everyday occurrence.  He stated that Bailey did not offend him, although Bailey said some things that "could

have been kept out of the workplace." He said that to his knowledge management was not around when Bailey spoke of sex. Spencer never complained to management about Bailey, nor did he hear anyone else do so.

**Veronica Neeley**

Ms. Neeley had been a stocker in the dairy department on the overnight shift until she was transferred to another department located "right next door." She said she heard some discussions of sex because "people talk." She said that she thought that Kirkpatrick and Cameron were at a meeting when Bailey made some comment about sex. She never heard Bailey express any sexual interest in Mr. Hill.

**Shawn Davis**

Mr. Davis, a convicted felon, was a dairy stocker with Toshiba Williams and Wesley Bailey. He said that he overheard discussions of sex, although he could recall only a single incident during which Bailey made a reference to "back door pussy." Davis also said that he had heard of an incident in which Bailey allegedly told Hill that Hill would not be able to distinguish between Bailey's buttocks and those of Ms. Williams because his were so smooth. Davis said that Bailey did not offend him, but that Bailey "crossed the line" with Mr. Hill, although Davis did not explain what was meant by the term nor whether the observation was based on something he may have witnessed

or something told to him by Mr. Hill.  Mr. Davis admitted that he had arranged for Hill to go to a prostitute.

**Jason Cooper**

Mr.  Cooper was an assistant manager in 2007.  He stated that Bailey never complained to him about Hill, and that Hill's many disciplinary problems were not related to Bailey.  Cooper had spoken to Hill after Wyatt complained about his unwanted attention.  Hill never complained to him about Mr. Bailey.  Cooper also met with Hill about the customer complaint concerning Hill's use of profanity.  He said that during that meeting Hill said nothing about harassment by Bailey.

**Michael Hill**

Mr. Hill testified that after 2003 he was the primary wage earner for his entire family.  Prior to his employment with Wal-Mart Mr. Hill had been terminated from his position at Winn-Dixie Stores, a fact he did not reveal on his application.  Mr Hill described himself as a quiet person intent on doing his job and going home.  He stated that because he was quiet and did not talk about sex or women  he believed his coworkers thought he was homosexual.  He stated that he  was uncomfortable around women.  He testified that although  he  was unaware of it until told by coworkers,  he would drop whatever was in his hands when spoken to by a woman.  Mr. Hill said  of his coworkers that **they** would encourage him to go up and say something to an attractive customer.  He said that **they** offered to buy a woman for him.  He testified that he was determined not to let **them** change

17

him into something that he was not.  (Emphasis added).  Mr. Hill believed that many women wanted to talk to him because they thought he was a "momma's boy."  Mr. Hill testified that he was the only virgin working at the store.

The first year that he was at Wal-Mart Mr. Hill saw Melvin "Wesley " Bailey only at evening meetings, during breaks and at lunch.  He knew Bailey to be gay.  He heard Mr. Bailey refer to himself as a "Sprinkle Queen."  Mr. Hill stated that Bailey would make comments about being gay but that he did not find Bailey's comments to be offensive.  Hill believed the comments were made generally and were not specifically intended for him. He indicated he believed that managers also heard Bailey make these comments. Other than the "sprinkle Queen" statement, however, Mr. Hill did not amplify on what was said , in what context, nor when.  Around Halloween in 2004 Mr. Bailey came to work dressed as a woman.  He spoke to Mr. Hill in the break room to ask if he could eat lunch with Hill.  While nothing else appears to have occurred during this encounter Mr. Hill became convinced that from that point forward Bailey was "pursuing him."  Hill testified that after that Halloween Bailey's comments became more specific.   Again, however, he did not state what was said nor the context.

Mr. Hill acknowledged that after Bailey came to work in the dairy department they would talk about homosexual activities.  Mr. Hill said that Bailey would tell him about gay parties.  Bailey was said to have told Hill that he kept "fake breasts" at home in a closet.  Hill said that Bailey told

18

him that he made Bailey hot and that because of that Bailey had to masturbate with a sexual device in shower.  Mr. Hill said that although he engaged in these conversations he did so only to learn more about homosexuals because he did not know any homosexuals  and wanted to be able to speak knowledgeably.  Mr. Hill also recounted that on one occasion Bailey "caught him looking" at a female customer and said "you wouldn't know what to do with that pussy what you need is some backdoor pussy."  Hill testified that on another unspecified date Bailey told him that he would bet that Hill could not distinguish Ms. Toshiba . William's buttocks from Bailey's because Bailey kept his so soft.

Mr. Hill resented the fact that Bailey was often praised by managers for his work.  He also believed that the managers would make him do things Bailey had asked him to do and he had refused.  At some point he decided to stop speaking to Bailey because of what he saw as undeserved praise.  He was called into the manager's office and told that "hostility" had been detected in the department which could hurt production.   Hill said he was offended because he believed the managers were "trying to make him talk with Bailey."  At the managers suggestion Hill and Bailey shook hands after the meeting.  Despite this opportunity to speak to his supervisors specifically about Bailey Hill did not use this meeting to complain that Bailey was sexually harassing him nor did he tell his supervisors  that Bailey was trying to cause him trouble because of Bailey's alleged sexual attraction.   Hill testified that before and after this incident he believed that Bailey was attracted to him because Bailey thought that he would be "easy to pursue because he was a virgin and a black

man." Hill also resented Bailey's telling him to stay in the dairy department work area. He recalled one occasion on which a female customer asked Hill where a certain item outside the dairy department could be found and he told her that he would take her to it. When he left the dairy department Bailey yelled at him to stay in his area and do his work. Hill told the customer that "He [Bailey] does not like me talking to females." Hill testified that he found it stressful that management told him " not to leave his department." Mr. Hill said that he became tired of "being called in and defending his work"and of the comparisons to Bailey.

Hill explained Ms. Wyatt's complaints as the product of his attempts to be "friendly." He said that when she told him he was too young for her he "let it go." Hill admitted that he was angry when Bailey told Wyatt that he had called her a "bitch." Hill did not deny that he had done so, but testified that he "didn't see the point of telling her because it would just make her upset." Hill stated that he thought that calling Ms. Wyatt a "bitch" was "not important to [her] life as a whole." Mr. Hill admitted that he has exposed himself to Ms. Williams in the cooler. Mr. Hill was convinced that "Tosha [Toshiba] ..had a crush on [him]." He blamed Melvin Bailey and Ms. Williams for "trying to get him into trouble." He claimed that the exposure of his penis was committed out of "sexual frustration" brought on by coercion from Ms. Williams and the fact that his resistance had been worn down because of "people constantly pressuring and badgering [him] about sex." Mr. Hill claimed that he exposed himself in the belief that if he did so "they would leave him alone." He also contended that his intent was to expose himself only to Ms. Williams and not Mr. Bailey. Hill

20

acknowledged that he knew that his conduct violated company policy.  Hill was aware of such policies because he, like Bailey and others, had received training in many forms including computer-based testing.

Hill testified that on one occasion he was stocking the dairy display with Bailey and Caprice Cameron.  Cameron told Hill that Bailey had said that Hill "needed a big dick up his ass."  When Hill later complained to Cameron about the comment she asked if he "wanted to make a sexual harassment complaint."  Hill testified that he told Cameron that he did not want to make a "formal" complaint.  He said that he did not make  complaint  because he did not want Bailey to be fired.  He said that he merely wanted to know what his options were.

Mr. Hill testified  that on August 10 , 2007 when first confronted about his  use of profanity in front of the customer he told Luther Daniels and other that Bailey was sexually harassing him.  Mr. Hill acknowledged that he had not mentioned in his deposition to telling Daniels about the harassment on August 10.  He also claimed that he had told Walsh at the termination meeting of the harassment by Bailey but admitted that he had not mentioned in that he told Walsh during his deposition either.  Mr. Hill explained the omissions by saying that he "might have missed a few details" in  his deposition.  Hill conceded that Gary Fuller had called two days after Hill had sent the two page single-spaced e-mail to Wal-mart objecting to his termination and in some measure

complaining about Bailey.  He was also aware that Fuller had asked him to return his call but that he had not done so.  He testified that he did not know that Fuller was calling about his complaint.

Mr. Hill complained of stress and a new general distrust of people because of his experience at Wal-mart.  Mr. Hill has no health insurance and has not been able receive counseling and treatment for the trust problems. He said that he chose not to be represented by a lawyer in prosecuting his lawsuit because of this distrust.  Hill conceded that he had failed to state that he had been fired by Winn-Dixie in his Wal-mart application because he thought he would have better chance of getting a job if he did not and that in his application to his current employer he stated that he left Wal-mart because "he wanted to go in a better direction."  According to Mr. Hill the latter statement was not false because he did want to go in a better direction.

## DEFENSE WITNESSES

**Cindy Brasher**

Ms. Brasher was told to interview Shawn Davis in August 2008 about Mr. Hill's complaints. She admitted that the only person she was asked to interview was Mr. Davis and that the instruction to do so came almost a year after Mr. Hill's termination and well after a charge had been filed with the EEOC.  Mr. Davis, then under indictment declined to say anything on the advice of counsel.

**Gary Fuller**

The Director of Human Resources extensively reviewed the scope of Wal-mart's anti-discrimination policy and methods of providing notice of the policy to all employees.  He defined the Open Door Policy as inclusive and broad.  He stated that there was  no record of any complaint by Mr. Hill until after he was fired.  He specifically recalled that when Hill telephoned him before the termination  meeting that Hill did not mention sexual harassment or Melvin Bailey.  He testified that because of the nature of his work he is very attuned not only to the word "sexual harassment " or other forms of discrimination but also to more subtle indicators of such complaints.  Fuller was certain that Hill did not indicate in any manner that he was harassed while employed with the company.

## APPLICABLE LAW

## STANDARD OF REVIEW

**SEXUAL HARASSMENT-HOSTILE WORK ENVIRONMENT**

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e–2(a)(1). Although Title VII does not mention sexual harassment, the Supreme Court and the Eleventh Circuit have recognized harassment as actionable under Title VII under a "hostile work environment" theory. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999).  A Title VII harassment claim under the "hostile work environment" theory is established

upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted).  It does not matter that Mr. Hill and his alleged harassers are both male, because same-sex sexual harassment is prohibited under Title VII. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).  However, Mr. Hill still "must show that but for the fact of [his] sex, [he] would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (citation omitted).

The elements of the causes of action asserted by Mr. Hill  are well-established.  To establish a hostile work environment claim based upon sexual harassment under Title VII, a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on the sex of the plaintiff; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.  *See, e.g., Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004). *See also Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *Mendoza v. Borden, Inc.*,

195 F.3d 1238, 1245 (11th Cir. 1999) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)).

As explained in *Mendoza*, "[s]exual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." *Id.* Title VII should not be treated as a federal civility code, and "an employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citation, quotation marks, and brackets omitted). This determination involves both a subjective and an objective component:

> The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive. Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

*Id.* at 1246 (citations, quotation marks, brackets, and ellipses omitted).

**"CATS PAW" THEORY**

Where a decision-maker acts in accordance with a harasser's decision without evaluating the plaintiff's situation, *i.e.*, a cat's paw theory, a plaintiff may establish the decision-maker acted with discriminatory intent. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1248-49 (11th Cir. 1998) (recognizing a cat's paw theory in Title VII employment discrimination cases); *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011) (discussing cat's paw theory under the Uniform Services

Employment and Reemployment Rights Act).  Courts have recognized, for example, that an alleged harassed may influence an employer's decision to fire an employee, *see Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1565 (11th Cir. 1987), or that an employer may fail to conduct an independent investigation and thereby act as a conduit for the harassed's discriminatory intent, *see Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996). In these cases, "the harassed is the decision maker." *Llampallas*, 163 F.3d at 1249 (emphasis in original). In *McShane v. Gonzales*, 144 F. App'x 779, 791 (11th Cir. 2005), the cat's paw theory was explained  as follows: "We have determined that, although causation may be established, even when the person with the unlawful animus is not the decision-maker, the actual decision-maker must have acted in accordance with this person's decision, without the actual decision-maker himself evaluating the employee's situation." *Id.* (citing *Llampallas v. Mini-Circuits Lab., Inc.*, 163 F.3d at 1249). The *McShane* court further remarked, "In a cat's paw situation, the person with the unlawful animus clearly causes the tangible employment action, regardless of which individual signs the employee's walking papers."  144 F. App'x at 791 (internal citations omitted).  In essence, the cat's paw theory is an alternative theory to establish causation when the decision-maker is not aware of the protected activity but is unduly influenced by a person who has retaliatory animus toward the employee.


**NOTICE**

The Eleventh Circuit has counseled that "the problem of workplace discrimination ... cannot be [corrected] without the cooperation of the victims, notwithstanding that it may be difficult for

them to make such efforts." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999).

There are two theories under which the employer may be held liable for a hostile work environment: (1) co-worker harassment or (2) supervisor harassment. If the alleged harasser is a supervisor the Supreme Court has established an affirmative defense which may be raised if no tangible employment action has been taken. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). An employer may avoid liability for a hostile work environment created by a supervisor by demonstrating "(a) that the employer exercised reasonable care to prevent and correct promptly any [ ] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765,118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). "Both elements must be satisfied for the defendant-employer to avoid liability, and the defendant bears the burden of proof on both elements." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1313 (11th Cir. 2001) (citations omitted). The Eleventh Circuit has found that where an employer has in place a comprehensive, vigorously enforced, anti-harassment policy that provides sufficient avenues of redress, an employee's attempt to report harassment to someone other than the persons specified in that policy does not put the employer on notice. *See Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1300 (11th Cir.2000)

An employer can not be held vicariously liable for the harassment of a co-worker unless the employer knew (actual notice) or should have known (constructive notice) of the harassment, and the employer failed to take remedial action. *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th

Cir. 2003).  Actual notice is established by proof that management knew of the harassment.  *Id.* When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established.  *Id.* Constructive notice, on the other hand, is established when the harassment was so severe and pervasive that management reasonably should have known of it.  The burden of proof is on the employee to prove actual or constructive notice.  *Id.* at 1257.

In the absence of proof of pervasive and obvious harassment a plaintiff will not sustain the legal burden by proving that he complained to some one whether a family member or even a coworker about alleged harassment.  The burden is on Mr. Hill to prove that he put Wal-Mart on notice of his alleged harassment by Mr. Bailey and his employer failed to act.  Even telling a manager that there has been objectionable conduct will not put the employer on notice the a plaintiff is making claim which requires a response.  *Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1309-10 (11th Cir. 2007) (reporting conduct to representative designated by sexual harassment plan insufficient to put employer on notice where employee did not properly communicate that the conduct was sexual harassment); *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1365 (11th Cir. 1999) (not unreasonable where employer failed to act on alleged complaint when employee did not adequately communicate that conduct of coworker was "a problem about which she was concerned or that required [employer's] immediate attention").

## FINDINGS OF FACT/CONCLUSIONS OF LAW

1. There were discussions of sex including homosexual sex on the overnight shift in the dairy department during Mr. Hill's tenure.

2. These  discussions and comments while not infrequent never rose to the level that they were  pervasive or severe so as put the defendant on notice of hostile work environment.

3. Michael Hill voluntarily participated in some of these conversations including conversations about homosexual activities.

4. Melvin Bailey did not seek to solicit sex from Michael Hill.

5. No one ever heard Bailey say that he was attracted to Mr. Hill.

6. Mr. Hill never complained that he had been sexually harassed by Melvin Bailey to any member of management at any level at any time until after his termination.

7. Mr. Hill  was disciplined because of his own misconduct and has failed to produce any evidence that Melvin Bailey was the cause of any disciplinary action.

8. Mr. Hill harassed at least two female coworkers during his term of employment with unwanted attention.

9. Mr. Hill committed acts of sexual misconduct ,including but not limited to, exposing himself to a female employee.

10. Wal-Mart management had no reason to know or believe that Mr. Hill was sexually harassed by Mr. Bailey as there was neither constructive nor actual knowledge of such a claim.

11. Melvin Bailey was proven to be  neither a supervisor nor a sexual harasser of Mr. Hill.

12. Mr. Hill sincerely subjectively believes that he was sexually harassed and exposed to unwelcome sexual comments.

13. Mr. Hill's subjective belief is objectively unreasonable in light of overwhelming evidence to the contrary.

14. Mr. Hill has suffered no injury for which Wal-Mart Stores, East might be liable as a result of sexual harassment.

## CONCLUSION

Michael Hill experienced anxiety and was under stress during his period of employment with Wal-Mart and at least some of the distress arose in the context of discussions of sex.  Mr. Hill was not the victim of actionable conduct on the part of his employer.  Despite a widely known policy against sexual discrimination Mr. Hill never sought to make known his concerns.  While objectively Mr. Hill has failed to satisfy the burden of proof of more than one  required element of his statutory claim, there is no question that his personal discomfort is and was quite real.

Mr. Hill's claims fail as a matter of fact and law.

**Accordingly,** Judgment by separate order will be entered in favor of the defendant.

Done this 7th Day of July, 2011.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE